HENRY B. MIKELBERG AND ROSE R. MIKELBERG, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HENRY B. MIKELBERG, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ROSE R. MIKELBERG, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 45524, 45525, 45526. Filed November 23, 1954.

*Eldridge Hood Young, Esq.*, for the petitioners.
*Edward Pesin, Esq.*, for the respondent.

344

OPINION.

Raum, *Judge:* 1. The deficiencies in controversy have been determined by the use of the so-called net worth method. Petitioners maintained no books or records of receipts from their practice of

medicine, and although there was testimony as to records reflecting unpaid charges or fees owing to petitioners no such records were produced. Nor were there produced any books or records detailing the rather large expenses which petitioners claimed as deductions on their returns. In the circumstances, it was entirely proper to resort to the net worth method, since an increase in net worth, after making appropriate adjustments for nondeductible living expenses, and the like, substantially in excess of income shown on the returns, may be persuasive evidence of understated net income. Cf. *Morris Lipsitz*, 21 T. C. 917, 931.

The fact that there are two taxpayers here presents no insuperable problem. Petitioners are husband and wife, and were such throughout the taxable years. The evidence shows that they pooled their assets; and whether a particular piece of property was acquired by them in both names, or in the name of one of them, does not appear to have any significance in this respect in the light of the evidence before us. The cases were consolidated for trial pursuant to motion consented to by petitioners, and indeed, during the course of the trial, when a question was raised as to which petitioner was the maker of certain checks, petitioners' counsel indicated that it was not material since the cases had been consolidated. Moreover, during 4 of the 6 taxable years involved herein petitioners filed joint returns (1944, 1945, 1948, and 1949). Certainly as to those 4 years, it was entirely appropriate to determine the increase in net worth of the composite assets in computing the net income to be attributed to both petitioners jointly. And even as to the other 2 years, 1946 and 1947, the increase in net worth of the petitioners' composite assets could be used in determining their composite net income for each of those years, thereby leaving merely the problem of allocating that composite net income between them, a problem which presents no insurmountable difficulties, provided that there is a reasonable basis for such allocation. We think that a reasonable basis exists in the evidence before us. Henry testified that Rose devoted to her practice about one-fifth of the time which he devoted to his. Evidence as to office hours kept by each and house calls made by Rose suggests a higher percentage; and in the returns actually filed by them for 1946 and 1947, the net income reported by Rose was about 45 per cent of the net income reported by Henry. In the circumstances, we think that respondent's position that 30 per cent of the composite net income be allocated to Rose is reasonable and in accord with the evidence. Our findings of fact as to the amounts of Rose's and Henry's net income for the years 1946 and 1947 reflect our conclusion that such allocation is factually justified and reasonable.

2. In applying the net worth method here the parties have stipulated many of the important items, including bank accounts, real estate, depreciable personal property, securities, liabilities, and depreciation. The parties, however, are not in agreement on (a) the amount of cash on hand as of January 1, 1944; (b) the source of deposits made into two savings accounts existing in the name of petitioners' daughter, Elinor; (c) the source of funds used to purchase United States Savings Bonds issued in Elinor's name; and (d) the amount of nondeductible personal living expenses incurred by the taxpayers in the taxable years.

(a) We heard considerable testimony regarding petitioners' contention that they had about $82,000 in cash on hand on January 1, 1944. Such testimony was at variance with admissions made by Henry to investigating agents on at least two occasions that petitioners had no accumulation of cash at the beginning of the taxable period.

Henry testified at length as to the sources for the alleged accumulation, and Rose undertook to corroborate some of the details. We had ample opportunity to observe them on the witness stand, and it is our conclusion that their testimony was unreliable and unworthy of belief in many respects. Henry's testimony that he had accumulated $30,000 by 1921 or 1922 which he at that time turned over to one Samuel S. Lear for investment was, in our opinion, incredible and false. To explain an accumulation in the amount of $30,000 at that time, he testified that he had substantial savings derived from earnings while working as a haberdashery clerk for the period ending with his graduation from medical school, that he earned a considerable amount of money treating civilian patients in France while in the Army, and that he had disproportionately high earnings during his first year or two of practice in Philadelphia. We think that much of that testimony was exaggerated or untruthful. Henry testified that Lear returned $26,500 to him in 1940. The details of the Lear transaction were so vague that we have little confidence in the entire story.[1]

The petitioners also assert, on brief, that "$2,500 a year would be a conservative and reasonable sum for them to have saved" producing a total of $37,500 for the years 1929–1943. The income tax returns filed during that period by petitioners make such a claim wholly

[1] The unreliability of Henry's testimony as to the Lear transaction is accentuated by the testimony of a former attorney of petitioners to the effect that Henry had stated to him that he received $18,000 from Lear in 1940. At the trial, objection was made to the former attorney's testimony on the ground that it was in violation of the attorney-client privilege. It was admitted only after the Court had been thoroughly satisfied that Henry's statement to the attorney was made for the purpose of having the attorney relate such information to Government agents. In the circumstances there was no confidential communication between client and attorney. In any event, the conclusions that we have reached herein are independent of the attorney's testimony, which we have treated merely as corroborative.

unreliable, and no evidence was introduced to show that this or any other amount was accumulated from earnings in those years.

We do not find it necessary to set forth and analyze all the evidence relating to the alleged accumulation of $82,000. Much of it is, in our judgment, false or exaggerated. However, we think, on all the evidence, that petitioners did have some accumulation of cash as of January 1, 1944, and it is our best judgment, based on the entire record, that the amount was $22,000. Cf. *Cohan* v. *Commissioner*, 39 F. 2d 540, 544 (C. A. 2). We have made a finding of fact to that effect.

(b) There is also disagreement between the parties on the source of some of the funds which were deposited into the two savings accounts existing in the name of petitioners' daughter. Petitioners contend that some of the funds deposited were received as gifts from petitioners' patients and unidentified relatives. Respondent's argument is that all of the money was given to Elinor by petitioners.

We agree with respondent. Petitioners themselves admit furnishing Elinor with some of the money. Their vague testimony as to Elinor's unidentified benefactors was not credible. Moreover, the regularity of the deposits during the school year and the almost identical amounts of a considerable number of those deposits strongly suggest a consistent source, namely, Elinor's parents. The stipulated facts and the evidence are convincing that petitioners supplied the funds for the deposits in Elinor's accounts.

(c) The petitioners contend that some of the Government bonds issued in the name of their daughter were gifts from their patients and relatives, and admit that the others were purchased by them. The respondent has determined that all of such bonds were purchased with petitioners' funds. The evidence tending to support the petitioners' contentions is based upon their own testimony. We have considered that testimony and do not believe their story that some of the bonds were purchased by others. We are satisfied on this record that petitioners furnished the money with which to purchase the bonds in question.

(d) The respondent determined that the petitioners had nondeductible living expenses as follows during the taxable years:

| | | | |
|---|---|---|---|
| 1944 | $2,500 | 1947 | $3,400 |
| 1945 | 2,800 | 1948 | 3,700 |
| 1946 | 3,100 | 1949 | 4,000 |

Petitioners contend that such expenses incurred by them were not in amounts as great as those determined by respondent. We think, however, that the respondent's determination is correct.

The petitioners testified that during the taxable years they had living expenses in minor amounts; that they lived frugally; never

entertained; bought almost no clothes for themselves or their daughter; and that most of their personal needs were satisfied by gifts from patients and others. We have not accepted all such testimony as fact. We think it highly improbable that petitioners spent as little as they would have us believe during the taxable years. Although they may have entertained little and received some gifts, the record fully supports the respondent's determination. In addition to normal day-to-day living expenses, the record shows such other nondeductible personal expenses as travel expense, insurance premiums, support payments to Rose's father and Henry's sister,[2] furniture purchased, and the like. We have found as a fact that petitioners incurred living expenses during the taxable years in amounts at least as great as those determined by the respondent.

3. The respondent has determined that a part of the deficiencies for each of the taxable years was due to fraud with intent to evade tax. We think that he has sustained his burden of proof in establishing such fraud.

Petitioners are both doctors of medicine and intelligent persons. They maintained no books and records from which their income could be determined. There is evidence to the effect that they were not cooperative with the investigating agents. Their testimony at the trial was frequently vague and evasive. Their net income was substantially understated in each of the taxable years. There is evidence that their explanations of their assets varied from time to time. We think the evidence is clear and convincing that the deficiencies are due at least in part to fraud with intent to evade tax, and we have so found.[3]

*Decisions will be entered under Rule 50.*

---

[2] Such support payments were, of course, not deductible in determining net income under the Internal Revenue Code of 1939. However, after net income has been determined, appropriate exemptions may be allowable for dependents in computing the tax.

[3] In view of this finding, the issues raised concerning the applicability of the statute of limitations must be decided in favor of respondent. Sec. 276 (a), I. R. C. 1939.