Louis Feingold v. Commissioner. Louis Feingold and Dorothy Feingold v. Commissioner.
Feingold v. Commissioner
Docket Nos. 41256, 41259.
United States Tax Court
T.C. Memo 1956-214; 1956 Tax Ct. Memo LEXIS 82; 15 T.C.M. (CCH) 1119; T.C.M. (RIA) 56214; September 19, 1956
*82 1. (a) Petitioner was engaged in the check cashing business, and also in illegal bookmaking activities during the relevant years. Bookmaking income was reported on his returns as "Commissions" or "Brokerage", but he kept no books or records from which the accuracy of the amounts reported as income from that enterprise could be ascertained. Held, the use of the net worth method to reconstruct petitioner's income for the years in question was justified; certain inaccuracies in respondent's net worth analysis are sulting from the net worth analysis, as so corrected, are sustained. (b) In 1948 petitioner advanced sums of money to a corporation run by one individual, hoping to acquire an interest in the business should it prove successful. Part of these amounts were repaid in 1948, leaving a balance at the end of 1948 in the amount of $10,661.98. No further repayments occurred and the corporation went bankrupt in 1949. Held, under the facts petitioner was not at any relevant time in the business of lending money, or of promoting, organizing, financing or lending money to business enterprises or organizations, and the amount in question, assuming it to represent a loan and not an investment, *83 constituted a nonbusiness loan and the loss due to its worthlessness in 1949 is deductible as a non-business bad debt. 2. Respondent failed to sustain his burden of proving fraud by clear and convincing evidence. 3. Additions for substantial underestimation of estimated tax are sustained. Richard S. Doyle, Esq., Jules G. Korner, III, Esq., and Eugene C. Fish, Esq., 213 South Broad Street, Philadelphia, Pa., for the petitioners. John D. Armstrong, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent, using the net worth method of recomputing income, has determined deficiencies and additions against petitioners as follows: Additions (I.R.C. of 1939)
Sec.
Sec.
Year
Deficiency
293(b)
294(d)(2)
1947
$ 599.43
$ 447.27
$ 53.67
1948
31,966.04
15,945.03
1,886.31
1949
3,914.24
1,957.12
234.22
1950
3,542.12
1,771.06
242.67
*84 Broadly stated, the issues are whether respondent erred in determining that petitioners had income in each year in excess of amounts reported, whether any part of any deficiency we may so determine was due to fraud with intent to evade tax, and whether respondent erred in determining the six per cent addition pursuant to Section 294(d) of the Internal Revenue Code of 1939 to be applicable. Numerous narrower issues combine to make up the issues as stated above, but will be dealt with under the broader headings above in the findings of fact and opinion to follow. Findings of Fact Petitioners are husband and wife, residing in Philadelphia, Pennsylvania. Their joint income tax returns for the calendar years 1948, 1949 and 1950, and the individual income tax return of petitioner Louis Feingold for the calendar year 1947 were filed on the cash basis with the then collector of internal revenue for the first district of Pennsylvania at Philadelphia. Louis Feingold will hereinafter be referred to as the petitioner. In 1945 petitioner purchased a check cashing business at 833 E. Allegheny Avenue in Philadelphia, and continued thereafter and at all times relevant to operate it as a proprietorship. *85 The principal business of this enterprise was cashing checks, selling American Express money orders, and accepting funds for the payment of utility bills. Fees varied according to the amount involved in a given transaction. The business was located in an industrial area, and most of its customers were residents of that section. In addition to operating the business at its principal location, petitioner would at various times go or send other persons to individual plants, firehouses and hospitals for the purpose of cashing pay checks. In 1950 he established a branch office on the premises of Cambria Enterprises, Inc. (hereinafter sometimes called "Cambria"), a short distance from his principal office. The operations of the check cashing business required a fund of cash on hand at all times. From the time petitioner first acquired the business it has been operated continuously, to the present time, and its volume of business has continued to increase. The balance of cash on hand in the check cashing enterprise as of the close of business on December 31 of each of the years 1946 to 1950, inclusive, was as follows: Year
Amount
1946
$ 5,000.00
1947
6,536.00
1948
6,124.55
1949
5,304.28
1950
25,878.91
*86 The volume of business at times required cash in excess of that available in the "exchange fund" used for that purpose. This was particularly true on paydays of local factories, and immediately before weekends and holidays. At such times petitioner would use in his business funds which he either borrowed from others or supplied from other resources of his own. Most of such borrowings were for short periods and were repaid within a few days. A double entry set of books was maintained for the check cashing business during 1948, 1949 and 1950. "Daily cash settlement sheets" were maintained for those years by petitioner's sister, who was in charge of the main office on E. Allegheny Avenue. For each business day these sheets showed the amount of cash on hand at the beginning and end of the day, the amount of checks cashed, utility bills received and money orders sold, and the profit on the day's operations. A separate column on the sheets was labeled "other sources", and accounted for alleged borrowings and certain other items. Petitioner's sister devised a system of putting down initials beside some but not all of the allegedly borrowed amounts. In many instances the initials were *87 those of petitioner. She did not adequately explain the significance of the initials. Petitioner's accountant prepared a transcript of an account entitled "Borrowed Money" from the information contained on those sheets. None of the amounts appearing in the "other sources" column was secured or evidenced by note or other instrument, and no record exists of interest paid. Petitioner did borrow various amounts which were evidenced by notes. The amounts of such loans outstanding at the end of each year were as follows: Year
Amount
1946
$10,000
1947
10,000
1948
5,000
1949
5,000
1950
6,000
In addition, petitioner was indebted to the Industrial Trust Co. on December 31, 1949, in the amount of $16,000 and on December 31, 1950, in the amount of $17,000. Petitioner was not in the money lending business, nor did he hold himself out as being so engaged. Nevertheless, he made loans to various persons and local businesses from time to time. No interest was charged on such loans. He also made funds available to persons who would cash payroll checks at industrial plants in the area, and received as compensation one-half of the profits realized. In addition, in 1948 *88 he supplied cash collateral to guarantee a bank loan of one Samuel Hoffman, who was a partner in Webb Jewelry Co. and a good friend of petitioner. As repayments were made, collateral was returned to petitioner. The amount of such cash collateral in the hands of the bank as of December 31 of each year was as follows: Year
Amount
1948
$10,000
1949
3,800
1950
800
During the years in issue petitioner was also in the business of taking bets on horses, also known as bookmaking. He operated this business on street corners and in saloons in the same general neighborhood as his check cashing business. He took bets himself, and in addition had an unspecified number of other persons working for him, who took bets in that capacity. The practice of petitioner and his employee bookmakers was to telephone their bets to a sheetwriter, who would be located in a room rented by petitioner. After the race the sheetwriter would inform petitioner of the results, and petitioner would pay the winners. Petitioner carried on his bookmaking activity six days a week. Bets taken ranged from $1.00 to $10.00, but most were $1.00 and $2.00 bets. Bookmaking was illegal. Petitioner was *89 convicted of that offense in 1948, and had been arrested a few times prior to that. Because of the illegal nature of that enterprise, petitioner kept no books and records thereof, other than the records of the sheet-writers, which he destroyed after retaining them for two or three days. He paid all expenses in cash, and took his living expenses from his bookmaking income. For the years 1947 to 1950, inclusive, he reported bookmaking income in his income tax returns, characterizing the amounts reported as "Commissions" or "Brokerage", as follows: Year
Amount
1947
$8,500
1948
9,500
1949
8,500
1950
1,000
The foregoing amounts are not based on any books or records, but represent an estimate by petitioner of his income from bookmaking. Although advised each year by his accountant to keep such records, he never did. In 1947 petitioner's brother, Morris Feingold, and one Goldstein formed a joint venture as jobbers to deal in factory-damaged shoes. Neither had credit resources, and Goldstein had a bad business reputation. As a result, they had to deal in cash. Petitioner provided all cash used in the operations of that venture in 1947. He would advance funds to *90 Morris in anticipation of a buying trip, and Morris would return any unused sums. No reliable records were kept of such advances and returned amounts. However, at the end of 1947 Morris Feingold, Goldstein and petitioner had a conference, as a result of which they estimated the net amount to be $10,500. Such amount was accepted by the interested parties as the correct amount owed to petitioner, and we find as a fact that it was substantially correct. During the early part of 1948 petitioner advanced an additional $4,500, making a total of $15,000 advanced by him. Goldstein had left the business for undisclosed reasons at the end of 1947. All money in the business came from petitioner, and he took over the business as a sole proprietor when Goldstein left. Losses were sustained and petitioner's equity in the business on June 30, 1948, was in the amount of $12,784.23. Thereafter, petitioner admitted Morris Feingold as an equal partner. The partnership operated on the basis of a fiscal year ending June 30. Its first fiscal year or period ended June 30, 1949. On June 30, 1949, petitioner's equity in the enterprise was $13,982.40, and on June 30, 1950, it was $14,734.01. Beginning in *91 February of 1948 petitioner began to borrow money from the Industrial Trust Co. During 1948 he borrowed sums as follows: February 11
$18,000.00
March 25
25,000.00
April 28
5,000.00
November 10
10,000.00
Petitioner posted cash collateral in the form of either certificates of deposit or treasurer's checks. By the end of 1948 all loans had been repaid and the collateral returned to petitioner. Petitioner kept a safe deposit box from which he took some of the cash used to purchase the aforementioned cashier's checks and certificates of deposit. In 1949 and 1950 petitioner again borrowed from the Industrial Trust Co., using cash as collateral in the same manner as in 1948. Such collateral held by the bank as of the end of the year in respect of loans to petitioner and of loans to Samuel Hoffman secured by collateral furnished by petitioner, were as follows: Amount of Collateral Held
Posted for
Posted for
Year
Hoffman
Petitioner
1948
$10,000
0
1949
3,800
$16,000
1950
800
12,000
In 1950, petitioner invested $35,926.81 in Cambria Enterprises, Inc., which consisted mainly of an arena used for wrestling and boxing exhibitions. *92 Henry Kretchmar was president of Peerless Woodcraft, Inc. (hereinafter called "Peerless"), at all times material until Peerless went into bankruptcy in 1949. Petitioner met Kretchmar at some undisclosed time in 1948, when payroll checks of Peerless which petitioner cashed were not honored by the drawee bank because of insufficient funds. Kretchmar and one Fisher, a disabled war veteran, owned substantially all of the stock of Peerless. Fisher was not active in the affairs of Peerless, and Kretchmar ran the business. Peerless was engaged principally in the manufacture of radio and television cabinets and small tables. Petitioner made advances to Peerless, at Kretchmar's urging, beginning in September of 1948. It was orally agreed that if the business, which was then not doing well and heavily in debt, should prosper, petitioner would receive some undefined interest therein. The purpose of petitioner was to strengthen Peerless and obtain an equity interest therein. All sums advanced were made by check and took place during 1948. They constituted the consideration paid by him for that interest. The dates, check numbers and amounts of such advances were as follows: Check No.
Date
Amount
434
September 3
$ 1,000.00
444
September 8
500.00
453
September 10
1,000.00
466
September 20
1,000.00
472
September 24
1,200.00
480
September 28
300.00
486
Undated
900.00
475
October 6
500.00
502
October 8
600.00
507
October 14
600.00
511
October 15
700.00
524
October 22
800.00
531
October 27
500.00
537
October 29
700.00
547
November 5
600.00
549
November 5
1,800.00
554
November 9
2,000.00
562
November 12
$ 600.00
569
November 15
300.00
575
November 19
1,500.00
590
November 26
900.00
595
November 30
347.32
Total
$18,347.32
*93 The foregoing advances bore no interest, and were unsecured. No notes or other evidence of indebtedness were given. In September of 1948, however, at the suggestion of petitioner's accountant, certain accounts receivable of Peerless were assigned to petitioner, as an arrangement for the repayment of the advances made. In this manner various amounts were repaid to petitioner in 1948. On December 31, 1948, the net amount of such advances was $10,661.98. Petitioner did not receive any further amounts in 1949 in respect of the foregoing advances to Peerless. Peerless went into bankruptcy in 1949, and petitioner was not listed as a creditor in the report prepared by the attorney representing the bankrupt. Petitioner's income tax return for 1949 treated the outstanding balance of advances to Peerless as a non-business bad debt which became worthless in 1949. A capital loss carry-over was claimed in the returns filed for each of the taxable years 1950 to 1954, inclusive. All of the foregoing returns were prepared by petitioner's accountant from information supplied by petitioner and petitioner's books and records. Petitioner executed a guaranty agreement in favor of the Industrial *94 Trust Co., guarantying loans to Peerless up to a limit of $10,000. On March 7, 1949, he was required to and did pay $5,382.28 on account of his guaranty. The amount due petitioner on account of advances to Peerless, as well as the amount due him on account of the foregoing guaranty payment, became worthless in 1949. On December 31, 1946, petitioner had $500 on deposit in a special account in his name at the then Security Bank & Trust Co. Respondent erroneously failed to take this item into account in recomputing petitioner's net worth as of December 31, 1946. In July of 1946 petitioner lent $10,000 to one William C. Falcey of Trenton, New Jersey. No note or other evidence of indebtedness, or security was then given, and no interest was paid on the original loan itself. In 1948 Falcey gave petitioner a note bearing interest at five per cent and secured by a mortgage upon his home in Trenton, New Jersey, to evidence his indebtedness. Petitioner reported interest income from this source in his returns for 1948, 1949 and 1950. The loan was outstanding throughout the years 1947 to 1950, inclusive. In 1946 petitioner purchased in his wife's name 55 shares of preferred stock and 300 *95 shares of common stock of the Braddock Frosted Foods Corp. of Hammonton, New Jersey. The total purchase price of the stock was $7,000. All of the funds used for the purchase originated with petitioner. Petitioner and his wife reported dividends from these shares on their joint return for 1950. Petitioner's wife continued to hold these shares throughout the taxable years in question. Petitioner's accountant established complete double-entry books in 1947 for the check cashing business. He also set up such books for the shoe business in December of 1947, and opened the books of account of Cambria in 1950 when petitioner acquired his interest in it. These books were kept separately and by different persons. Petitioner had no knowledge of bookkeeping, and never attempted to keep the books himself, or give any orders or instructions to others as to how such books were to be kept. He had no formal set of books prior to 1947. Certain records were produced purporting to constitute the books and records of Peerless. Various persons had made entries therein. One such person testified as a witness in these proceedings. She had had no bookkeeping training, did not know how to keep a set of *96 books, couldn't make a trial balance, and was unable to tell whether a given sheet was a ledger or journal page. The foregoing records do not constitute a complete set of books. Much of what exists was kept in an inaccurate and contradictory manner. The "books" could not be balanced, and would not be accepted by respondent's agent as competent to show the true income of Peerless. Petitioner's returns for 1947 through 1950, inclusive, were examined by one of respondent's agents. The agent found no discrepancies between the books of those enterprises of petitioner wherein books were kept and the amounts of income and deductions reported from such ventures. No source of income not reflected on the returns was discovered. However, petitioner produced no books or records substantiating his reported income from gambling, and the agent thereupon made his determination of petitioner's income on the net worth basis. The assets, expenditures and other items establishing the correct increases in net worth and the correct net income of petitioner Louis Feingold individually, for the year 1947, and petitioners Louis and Dorothy Feingold jointly for the years 1948 through 1950, are as follows: *97 Louis Feingold and Dorothy Feingold
Net Worth Analysis
ASSETS
12-31-46
12-31-47
12-31-48
12-31-49
12-31-50
Real Estate
833 E. Allegheny Ave.
$ 8,000.00
$ 8,000.00
$ 8,000.00
$ 8,000.00
$ 8,000.00
6124 Loretto Ave.
5,300.00
5,300.00
5,300.00
5,300.00
5,300.00
2218 Frankford Ave.
4,800.00
4,800.00
4,800.00
4,800.00
4,800.00
3080 Ruth Street
1,500.00
1,500.00
1,500.00
1,500.00
1,500.00
Business Assets
Automobile
1,600.00
1,600.00
3,618.23
3,618.23
3,618.23
Furniture and Fixtures
1,000.00
1,358.44
1,358.44
1,763.44
3,319.81
Security Bank & Trust Co. - Balance
17,860.38
7,485.84
7,996.80
7,515.71
752.86
Industrial Trust Co. - Balance
1,807.35
15,379.45
18,277.40
21,216.19
4,655.00
Escrow Deposits
500.00
775.00
850.00
850.00
850.00
Exchange Fund
5,000.00
6,536.00
6,124.55
5,304.28
25,878.91
Returned Items
112.05
299.76
489.04
Taxes Withheld
169.78
Cash in Safe Deposit Box
15,000.00
15,000.00
15,000.00
15,000.00
15,000.00
Loans Receivable
L & M Feingold Shoe Co.
10,500.00
1,000.00
Peerless Woodcraft, Inc.
10,661.98
S. J. Celani
5,000.00
Webb Jewelry Co.
5,000.00
William Falcey
10,000.00
10,000.00
Investments
L & M Feingold - Partnership
$ 12,784.23
$ 13,982.40
$ 14,734.01
Cambria Enterprises, Inc.
35,926.89
Mortgage - 126 Albion Pl., Atlantic
City
16,000.00
15,000.00
Mortgage - Trenton, N. J. (Falcey)
10,000.00
10,000.00
10,000.00
U.S. Savings Bonds
13,537.50
13,537.50
13,537.50
13,537.50
U.S. Treasury Series "G" Bonds
13,000.00
Cooper Brewing Co. stock (1,000 shs.)
3,830.00
3,830.00
Braddock Frosted Foods, Inc. stock
7,000.00
7,000.00
7,000.00
7,000.00
7,000.00
Other Assets
Ninth Bank & Trust Co. Balance (Mrs.
Feingold)
2,552.03
382.54
2,009.80
3,469.97
686.72
Collateral to secure S. Hoffman loan
10,000.00
3,800.00
800.00
Collateral to secure own loan
16,000.00
12,000.00
Beneficial Savings Fund balance (Mrs.
Feingold)
135.00
Total Assets
$95,457.26
$113,096.82
$143,948.69
$164,146.76
$188,127.21
LIABILITIES
Reserve for Depreciation - Buildings
1,239.29
1,557.29
1,875.29
2,193.29
2,511.29
Reserve for Depreciation - Furniture &
Fixtures
100.00
203.82
339.66
495.75
722.62
Reserve for Depreciation - Automobile
226.14
1,128.16
2,032.72
Loans Payable - Industrial Trust Co.
16,000.00
17,000.00
Other Loans Payable
10,000.00
10,000.00
5,000.00
5,000.00
6,000.00
Money Orders Unremitted
458.70
3,047.83
2.70
Utilitiy Bills
232.72
Total Liabilities
$11,339.29
$ 12,452.53
$ 10,488.92
$ 24,819.90
$ 28,266.63
Net Worth
$84,117.97
$100,644.29
$133,459.77
$139,326.86
$159,860.58
Net Worth of Prior Year
84,117.97
100,644.29
133,459.77
139,326.86
Increase in Net Worth
16,526.32
32,815.48
5,867.09
20,533.72
Add: Capital Losses
Cooper Brewing Co. stock
1,080.00
Non-business Bad debt (Peerless)
10,661.98
Total Capital Losses
11,741.98
Less: Allowable Deduction
1,000.00
Capital Loss Carry-Over
1,000.00
Adjusted Increase in Net Worth
16,526.32
32,815.48
16,609.07
19,533.72
Additions: Estimated Living Expenses
2,600.00
2,600.00
2,600.00
2,600.00
Specific Expenditures
Fine and Cost - Arrest (1948)
325.13
Insurance Premiums - Mrs. Feingold
1,760.39
Insurance Premiums - Frank Fein-
gold
1,000.00
1,000.00
Strawbridge & Clothier
490.90
515.96
743.43
571.03
Temple University Hospital
243.70
Presbyterian Hospital
153.12
Dr. James N. Coombs
250.00
Dr. R. H. Ivy
300.00
Federal Income Taxes Paid
7,632.58
9,388.71
2,748.38
3,161.17
Contributions
471.00
743.00
Interest
241.35
Philadelphia Taxes
797.76
957.67
Trip to Florida
709.52
Adjusted Gross Income as Corrected
$ 27,249.80
$ 46,138.98
$ 25,422.76
$ 31,277.85
Less: Standard or Claimed Deductions
500.00
1,000.00
1,268.76
1,942.02
Net Income as Corrected
$ 26,749.80
$ 45,138.98
$ 24,154.00
$ 29,335.78
Net Income Per Return or Prior
RAR
20,559.46
16,396.86
17,408.65
18,879.89
Increase in Net Income
$ 6,190.34
$ 28,742.12
$ 6,745.35
$ 10,455.89
*98 The notices of deficiency were mailed on April 4, 1952. Petitioner's income tax return for the year 1947 was filed more than three years prior to that date. On January 3, 1952, petitioner and respondent entered into an agreement extending the period of limitation upon assessment of income tax for the year 1948 to June 30, 1953. Petitioner made payments on declarations of estimated tax as follows: Year
Amount
1947
$5,624.73
1948
3,250.00
1949
3,000.00
1950
3,000.00
Petitioner was not engaged in the business of lending money, or of financing, organizing, promoting or investing in enterprises or business ventures during any of the years in question. The advances to Peerless were not made in the course of any trade or business regularly carried on by petitioner. Such advances became worthless in 1949. Petitioner's net income was understated in each of the years 1947 to 1950, inclusive, in the following amounts: Amount of
Year
Understatement
1947
$ 6,190.34
1948
28,742.12
1949
6,745.35
1950
10,455.86
None of the deficiencies attributable to the foregoing understatements was due to fraud with intent to evade tax. The deficiency *99 and additions for 1947 are barred by the three-year statute of limitations. Respondent did not err in determining additions for substantial underestimation of estimated tax for the years 1948 to 1950, inclusive. Opinion RAUM, Judge: 1. Petitioners complain at the outset about the Commissioner's use of the net worth method of computing income. However, petitioner Louis Feingold was engaged, inter alia, in illegal gambling activities and kept no permanent books and records from which his gambling income could be determined. Moreover, resort to the net worth method is entirely proper even where books are kept, for it may reveal a substantial gap between actual income and income as shown on the books, thus furnishing persuasive evidence that the books themselves are unreliable. See Estate of George L. Cury, 23 T.C. 305, 333-334; Henry B. Mikelberg, 23 T.C. 342, affirmed, 234 Fed. (2d) 34 (C.A. 3); Estate of Michael Potson, 22 T.C. 912, 927, affirmed, 230 Fed. (2d) 336 (C.A. 7); Morris Lipsitz, 21 T.C. 917, 931, affirmed, 220 Fed. (2d) 871 (C.A. 4), certiorari denied, 350 U.S. 845. *100 We hold that the net worth method is proper here. The case was tried upon the net worth theory. The parties were in agreement as to a considerable number of the items on the Government's net worth statement, and the trial was devoted largely to the remaining items. Our findings of fact have resolved the controversy as to such items, and we shall comment here briefly on some of them. Needless to say, our findings are based in part upon our view as to the credibility of the witnesses, and in some situations where it was impossible to determine precise amounts from credible evidence we exercised our best judgment on the record (cf. Cohan v. Commissioner, 38 [39] Fed. (2d) 540, 544 (C.A. 2)). a. Exchange fund. Petitioner's check cashing business required a fund of cash on hand at all times, and we think that respondent erred in failing to credit him with any amount therefor as of December 31, 1946. In fact, respondent's agent admitted that such a fund had to exist and that his failure to include any amount was due to his inability to determine the precise sum. We must do the best we can on the basis of the believable facts before us. Such a fund undoubtedly existed on December 31, 1946. Taking *101 into consideration amounts on hand as of the close of each of the following years, and the fact that the business was growing during this period, our best estimate is to the effect that there was $5,000 in this fund as of December 31, 1946, and we have so found as a fact. b. Cash in safe deposit box. Petitioner contends that the Government failed to credit him with $28,000 in cash in a safe deposit box which was said to have been used up during the years before us. The testimony with respect to such alleged cash was vague and was contradicted by other testimony. We think that petitioner did have cash in his safe deposit box on December 31, 1946, but not in the amount claimed by him, and it is our best judgment that the amount was $15,000. Cf. David J. Pleason, 22 T.C. 361, 371, affirmed, 226 Fed. (2d) 732 (C.A. 7), certiorari denied, 350 U.S. 1006. However, we are not satisfied by the record that this cash was depleted during the taxable years, despite petitioner's rather vague and somewhat loose testimony to that effect. c. L. & M. Feingold Shoe Co. The record seems to support petitioner's claim that he advanced funds to a shoe business *102 operated by his brother and one Goldstein in 1947, and that a fair estimate of the total net amount of such advances is $10,500, and we have found so as a fact. d. Advances to Peerless. Peerless Woodcraft, Inc., was a corporation dominated by Henry Kretchmar. During 1948 petitioner made a number of advances for use in the corporation's business. A controversy has developed between the parties as to the total net amount of such advances and as to whether they were made to Kretchmar personally or were loans to the corporation. Kretchmar appeared as a Government witness, but we found his testimony contradictory and unreliable. On the entire record, we think that petitioner has carried his burden of proof. We have found that the loans were made to Peerless, and that the net amount outstanding as of December 31, 1948, was $10,661.98. e. Borrowings by petitioner. Petitioner contends that the Government's net worth statement is in error in failing to reflect alleged borrowings made by him in his check cashing business. There was testimony that additional amounts were sometimes needed in that business to finance its operations at the time of certain holidays, or pay days, or over week-ends, *103 and that such additional amounts were supplied to the business for periods of a few days on each such occasion. The testimony as to the making of such alleged loans was vague and unsatisfactory. There was much to suggest that Louis Feingold himself simply made some of his own funds available to the check cashing business for such brief periods. Perhaps he may have borrowed part of those funds but we are not convinced that the greatest part of such "borrowings" did not come from petitioner himself; nor are we satisfied that any amount outstanding at the end of any year before us represented borrowings from others. Furthermore, we do not believe testimony to the effect that several persons left sums on deposit with petitioner for long periods of time. Only one such alleged depositor testified, and having observed him and heard his testimony we do not find it reliable. We do not accept as credible his story that he deposited with petitioner $7,500, representing his life savings, without security, interest or other compensation, or even any written evidence of such indebtedness. To the extent that our findings under "Liabilities" in our net worth statement show loans payable, the parties *104 are in agreement, and we do not have credible evidence before us justifying a finding of any additional amounts. f. Kensington Ave. mortgage. Contrary to respondent's request, we have not included a mortgage at 2960 Kensington Avenue, because it was purchased in 1947 (when petitioner filed a separate return) by Dorothy Feingold, using funds from her own bank account. It does not represent additional income to petitioner Louis Feingold in 1947. The inclusion of that item by respondent would cause it to have that effect, and we have accordingly omitted it. 2. The parties are in disagreement as to the effect of the bankruptcy of Peerless in 1949. In view of our finding that the advances in question were loans to Peerless we hold that they became worthless in 1949. However, we are satisfied that petitioner was not in the money lending business, and that these loans were not proximately related to petitioner's check cashing business or any other business carried on by him. Accordingly, we must hold, contrary to petitioner's contention, that the $10,661.98 item became a non-business bad debt in 1949. Cf. A. Kingsley Ferguson, 16 T.C. 1248; Estate of William P. Palmer, Jr., 17 T.C. 702; *105 Jan G. J. Boissevain, 17 T.C. 325; Charles G. Berwind, 20 T.C. 808, affirmed, 211 Fed. (2d) 575 (C.A. 3); Hadwen C. Fuller, 21 T.C. 407; Commissioner v. Smith, 203 Fed. (2d) 310 (C.A. 2); Dalton v. Bowers, 287 U.S. 404; Burnet v. Clark, 287 U.S. 410; Deputy v. Dupont, 308 U.S. 488. Also, in connection with the bankruptcy of Peerless, petitioner was required to and did pay $5,382.28 to the Industrial Trust Co. in 1949 in accordance with a guaranty agreement in favor of the bank with respect to a loan which the bank had made to Peerless. We reject respondent's theory that this payment represented a "gift" to Peerless. However, if this item is to be treated as a bad debt (cf. Putnam v. Commissioner, 224 Fed. (2d) 947 (C.A. 8), pending on certiorari), then it merely augments the non-business bad debt already suffered by petitioner in connection with its advances to Peerless and can provide no further tax benefit to petitioners during the years before us. On the other hand, even if it is to be treated as an ordinary loss (cf. Pollack [Pollak] v. Commissioner, 209 Fed. (2d) 57 *106 (C.A. 3); Cudlip v. Commissioner, 220 Fed. (2d) 565 (C.A. 6)), it can be of no aid to petitioners in the circumstances of this case. For, this is a net worth case, and the payment of the $5,382.28 has not been included by the Government as an expenditure or asset in its net worth statement; accordingly, before the loss attributable to that amount can be deducted, it would have to be shown first as an available asset, with the consequence that the deduction would merely be offset by such additional asset. 3. Respondent bears the burden of proving fraud. The mere fact that we may sustain deficiencies does not relieve respondent of affirmatively sustaining this burden by clear and convincing evidence. Arthur M. Godwin, 34 B.T.A. 485, 495; Miller-Pocahontas Coal Co., 21 B.T.A. 1360; Drieborg v. Commissioner, 225 Fed. (2d) 216, 218 (C.A. 6). We cannot find that he has done so, and must therefore hold that he erred in determining the additions for fraud. As a consequence, the deficiency for 1947 is barred by the statute of limitations, Section 275(a), I.R.C. 1939. There is no claim that the five-year period provided in Section 275(c) *107 applies. Petitioners appear to have abandoned their contention that the statute of limitations bars the 1948 deficiency. The execution of a waiver with respect to that year clearly extended the period of limitations to a time subsequent to the mailing of the notices of deficiency. 4. Respondent has determined that the addition pursuant to Section 294(d)(2) for substantial underestimation of estimated tax is applicable to each year in issue. We hold that petitioners have shown no error in this determination, which, however, will be applicable here only to the years 1948-1950 (since 1947 is barred), and which must be adjusted to take into account the basic deficiency attributable to the unreported income as determined herein. Decisions will be entered under Rule 50.