MARTIN STERN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stern v. Commissioner
Docket No. 7560-78.
United States Tax Court
T.C. Memo 1984-383; 1984 Tax Ct. Memo LEXIS 290; 48 T.C.M. (CCH) 605; T.C.M. (RIA) 84383; July 25, 1984. J. Fleet Cowden, for the petitioner. Michael R. Morris, and Christine B. Barish, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax for 1970 and 1971 as follows: Additions to Tax Under Sections
Year
Deficiency
6653(b) [1]
6654
1970
$391,574.64
$199,287.32
$12,649.39
1971
415,921.37
207,960.69
13,309.48
The issues for decision are: (1) Whether petitioner received income from the sale of "bootleg" tapes in 1970 and 1971. [2]
(2) Whether petitioner is liable for the additions to tax for fraud under section *292 6653(b), and (3) Whether petitioner is liable for the addition to tax for failure to pay estimated tax under section 6654. FINDINGS OF FACT Some of the facts have been stipulated and others have been deemed admitted pursuant to Rule 91(f). These facts are so found. The stipulation of facts, together with the relevant exhibits, are incorporated by this reference. On October 10, 1974, petitioner was convicted of Federal income tax evasion, willful failure to file a Federal income tax return, and conspiracy to defraud the United States of payment of withholding rax for the calendar year 1970, in violation of 26 U.S.C. sections 7201 and 7203, and 18 U.S.C. section 371 (1966), connection with the operation of a so-called "bootleg" tape business. [3] Petitioner Martin Stern resided at a Federal Corrections Institute in San Pedro, California when he filed the petition in this case. *293 The convictions for tax evasion and failure to file a return related to the calendar year 1970, and the conspiracy conviction covered the period through April 15, 1971. [4] The parties have stipulated the transcript from the criminal trial and also stipulated that the witnesses who testified at the criminal trial would have offered the same testimony if called upon to testify before this Court. Early in 1970, petitioner entered into a business venture with an individual, James C. Borlaug (Borlaug). The purpose of this venture was initially to sell bootleg tapes that had been manufactured by others, and eventually to manufacture the tapes as well. Borlaug had experience with the sale of bootleg tapes through his prior involvement in a business known as Custom Tapes. Custom Tapes distributed and sold bootleg tapes that had been manufactured by an individual named Donald Washbrook. That business commenced in late 1969, and terminated, *294 for the most part, in February of 1970. [5] Custom Tapes ceased to operate when a lawsuit was filed by the National Broadcasting Company and Columbia Broadcasting Systems, seeking to enjoin Borlaug and others from the manufacture of unlicensed recordings. Petitioner had been employed as a revenue agent of the Internal Revenue Service from 1955 until 1962, and had aided others in the preparation of Federal income tax returns before he became involved in the bootleg tape business. Petitioner and Borlaug each contributed start-up capital of $6,700 to the 1970 business venture. Petitioner made further advances to the business as the need arose in order to protect his investment. Borlaug brought the customer list from Custom Tapes to the new business. In addition, he brought several people who had worked for him at Custom Tapes, including Louis Aiello (Aiello) and Thomas McDonough (McDonough). To a significant extent, the new business was a continuation of the business of Custom Tapes. In commencing this business operation, petitioner *295 and Borlaug agreed that petitioner would receive 20 percent of the profits, and that Borlaug would receive 80 percent of the profits. Borlaug intended to distribute a portion of his profit share to McDonough and Aiello, his former employees from Custom Tapes. Aiello was to be responsible for selling the tapes, and McDonough was to be in charge of manufacturing and shipping the tapes. In March of 1970, petitioner brought Jack Fine (Fine) into the business venture. Fine was bankrupt when he joined the venture, and petitioner considered Fine to be "judgment proof." The business venture adopted the name of American Manufacturing Company (AMC). [6] Fine subsequently opened a bank account under the fictitious name of George Miller and on behalf of AMC. Petitioner accompanied him to the bank for that purpose. Fine's original responsibility with AMC was to receive checks and money orders tendered by customers as payment for bootleg tapes and to convert them to cash. In exchange, Fine was to receive 5 percent of the gross receipts. By having Fine receive all payments, both petitioner and Borlaug intended that Fine would take responsibility for any civil or criminal liabilities incurred. *296 On April 4, 1970, a preliminary injunction was issued pursuant to the lawsuit filed by the National Broadcasting Company and Columbia Broadcasting Systems, against, among others, Custom Tapes and Borlaug. Borlaug and others associated with Custom Tapes were thereafter prohibited from engaging in the manufacture and sale of unlicensed recordings in the state of California. At about that time, Washbrook, who had been manufacturing the bootleg tapes for AMC, refused to engage in further transactions with the business. Borlaug consequently advised petitioner that they were out of business. Petitioner then obtained credit to lease the machinery necessary to produce bootleg tapes. Petitioner personally obtained credit for at least 60 percent of the equipment leased. [7]
AMC originally maintained *297 one plant in Los Angeles, California, for assembling eight-track tapes, and one plant in Chatsworth, California, for duplicating tapes. As of March of 1970, AMC was selling 10, 000 to 12,000 eight track tapes per week. The business grew rapidly, however, and by the summer of 1970 the sales volume reached 25,000 to 30,000 units per week. AMC charged $1.75 per eight track tape and made a profit of $1.00 per tape. Customers were contacted by telephone; they were not permitted to contact the business directly. All payments were to be made in advance, by check or money order, and were to be made payable to AMC or Jack Fine. AMC usually paid its suppliers and its employees in cash, and its principals were observed carrying large quantities of cash with them. [8]
Until approximately June of 1970, Fine would meet with petitioner and Borlaug at petitioner's apartment. At these meetings, which occurred approximately every two weeks, Fine would deliver the cash he had obtained, and would take a 5 per cent share of the receipts. He *298 recorded on a slip of paper the amount of payments received, and the amounts paid to suppliers and employees. These records were not made available to respondent or to this Court. In June of 1970, Fine and Borlaug had an argument concerning some tapes which had been delivered but for which payment had not been received. After this argument, Fine no longer met with Stern and Borlaug to deliver the receipts. Instead, he delivered the funds to McDonough, who had worked for Borlaug at Custom Tapes. At about this time, Fine became involved in other aspects of the business. He often delivered merchandise to the airport, where it was shipped to customers, and he spent a great number of hours at the plant. He picked up and cashed money orders at a Western Union office from April, 1970 through April, 1971 on a daily basis. In the beginning of August, 1970, AMC moved its Lose Angeles plant to expanded quarters in the city. Petitioner participated in locating the new business premises. Petitioner's other business activities during 1970 included: delivering product samples, purchasing supplies, meeting with suppliers, personally placing orders, meeting with prospective purchasers, selling *299 tapes, and delivering tapes. [9]
Neither petitioner nor Borlaug supervised the plant, nor did they visit it frequently. Like petitioner, Borlaug at times placed and shipped orders. In addition, Borlaug helped to design the artwork on tape labels and a catalog describing AMC's products. Borlaug kept records of accounts receivable, and sometimes directed where customers were to make payments. Petitioner knew that Borlaug maintained written records of all *300 payments received, yet he never requested the opportunity to examine them. During the fall of 1970, Borlaug expressed concern that petitioner and AMC were receiving too much public attention. Borlaug feared that his association with the business while under injunction could subject him to criminal liability, and he informed petitioner that he no longer wished to be seen associating with him. Borlaug rarely had contact with petitioner after this discussion; he did, however, continue to participate in the business venture. In addition to working on design labels, Borlaug continued to monitor AMC's sales. Sometime that fall, Borlaug suggested to petitioner that they move the business to Arizona because, "in Arizona they don't have any laws against this." Petitioner flew to Arizona in order to locate suitable premises, and subsequently negotiated a lease on a warehouse in Phoenix. In late December or early January of 1971, AMC moved to Phoenix. The business paid for the transportation of thirty to forty employees from Los Angeles to Phoenix. Records from AMC were boxed and transported from California to the Phoenix warehouse. In Arizona, AMC chose to do business under the name *301 National Manufacturing Company (NMC). The product subsequently manufactured and sold by NMC bore a label identical to the one previously used on the tapes manufactured in California. Customers of NMC met with the same individuals they had met with when dealing with AMC. In accordance with the business' practice of having customers address it by a variety of names, some customers were asked to address the business by the names, "Deeds Electronics," "A.L.P. Distributing Company," and "The Don Gold Company." Customers consequently paid for their orders with checks and money orders made out to AMC, Jack Fine, The Don Gold Company, A.L.P. Distributing Company, or Deeds Electronics. Petitioner actively participated in certain aspects of the business after it moved to Phoenix and generally continued to exercise a proprietary interest. He continued to meet with customers with whom he had done business in 1970 in an effort to encourage additional sales. A number of customers continued to make purchases through December of 1971. Petitioner visited the Phoenix plant at least once in 1971. He also appeared on a television news interview conducted by a Phoenix television station on the *302 premises of the Village Tape Shop, Phoenix, Arizona. During his television appearance, petitioner promoted what he referred to as "his" product. AMC realized net profits of $612,149.45 in 1970 and $604,301.10 in 1971. In late 1970, petitioner suspected that he would be audited by the Internal Revenue Service for the 1970 taxable year. He filed an estimated tax return on January 11, 1971 and paid tax in the amount of $7,000. Petitioner knew that his $7,000 payment did not accurately represent his tax liability. Although he knew that Borlaug maintained a ledger recording all of AMC's sales and disbursements, he never sought to examine the ledger. Petitioner kept records of all monies he received from AMC in 1970, [10] yet he did not report this income in a Federal income tax return. He followed this same procedure during the 1971 taxable year, and failed to file Federal income tax returns for the taxable years 1970 and 1971. OPINION Petitioner *303 entered into a business venture with James C. Borlaug (Borlaug) in 1970. The purpose of the venture was to manufacture and sell bootleg tapes.The business, generally known as the American Manufacturing Company (AMC), flourished during 1970. Sales increased from approximately 10,000 units per week in March to approximately 30,000 units per week by that summer. AMC was a covert operation from its inception. Customers were contacted by telephone, and were instructed to pay for their orders in advance, with either checks or money orders. Jack Fine, who was hired to "front" for the business because he was considered "judgment proof", cashed these instruments on a daily basis throughout the years in issue. In 1971, at Borlaug's suggestion, the business was moved from California to Arizona because the laws of Arizona afforded a more favorable climate for their illicit operation. The name of National Manufacturing Company (NMC) was adopted for the business in Phoenix.Customers and suppliers a AMC and NMC were asked to refer to the business by a variety of other names, including Deeds Electronics, A.L.P. Distributing Company, and the Don Gold Company. Petitioner was active in the *304 business in both 1970 and 1971. Although he claims to have maintained records of all profits he received from the business, he failed to produce them both in this proceeding and during his trial for criminal tax evasion. Whatever amounts petitioner received were in the form of cash, and were not deposited into a bank account. Although he failed to file Federal income tax returns for 1970 and 1971, petitioner did file estimated returns for both years in which he claimed income tax liability of $7,000 and $3,000 respectively. He was convicted of criminal tax evasion for the year 1970. Respondent determined in the deficiency notice that AMC realized net profits of $612,749.45 in 1970, and $604,301.10 in 1971. He claims that the net profits are allocable in their entirety to petitioner. Petitioner does not contest respondent's computation of the net profits of the business, but rather challenges respondent's allocation of all of the net profits to him. As a "mere investor" in the business, petitioner claims that he received no more than $12,000 in excess of his "investment" in 1970, and that he was entirety dissociated from the business in 1971. We accept respondent's calculations *305 of the net profits. [11] Neither party has taken a persuasive position, however, with respect to the allocation of income to petitioner. We are convinced that some but not all of the income should be allocated to petitioner. In addition, respondent has assessed additions to tax under section 6653(b), and section 6654. We agree that these additions should be imposed, although the amounts should be modified in accordance with our decision on the underlying deficiency. Issue 1. Income of the Business
Respondent calculated gross receipts from the bootleg enterprise for 1970 by a hybrid "bank deposit" and "specific item" method of proof. Included in the determination of gross receipts were (1) bank deposits made to accounts *306 in the name of AMC, (2) specific instruments made payable to AMC or Jack Fine that were cashed at those banks, (3) money orders cashed at Western Union, and (4) third party checks and Western Union money orders endorsed on behalf of AMC. In determining gross receipts for 1971, respondent used the specific item method of proof, and included items made payable to A.L.P. Distributing Company, Deeds Electronics, and the Don Gold Company, as well as AMC and Jack Fine. [12] At trial, petitioner's counsel informed the Court that respondent's determination of the net profits of the business is not disputed. Accordingly, we accept that determination here. Issue 2. Allocation of Income to Petitioner
The more difficult issue in this case is how much of the income of the business is taxable to petitioner. Respondent *307 would have us believe that despite the many hands through which the cash was passed, and despite an agreement to the contrary, petitioner received all of the net profits of the business for both years in issue. While it is true that respondent's determination of a deficiency is presumptively correct, we nevertheless cannot sustain respondent's position. While petitioner was a moving force in the business, a realistic appraisal of the facts shows that petitioner simply did not control the business and its cash flow sufficiently to enable him to command its entire net income. Petitioner was unable to monitor the cash receipts and cash outlays of the business.Aiello informed customers by telephone how and where to make payment. Fine cashed all checks and money orders. After June of 1970, Fine delivered the cash to McDonough. [13] McDonough reported to Borlaug, who alone maintained the business records. McDonough and Aiello had been previously associated with Borlaug and presumably retained a loyalty to him, and not to petitioner. These circumstances, coupled with the covert nature of *308 the business which necessarily deprived petitioner of most of the ordinary safeguards and remedies available to partners engaged in a legitimate enterprise, persuades us that petitioner did not receive a good deal more of the business income than he originally bargained for. Borlaug did become ill but was always a tall figure in the background. While Stern became more of a factor in the business, we do not believe Borlaug that Stern intimidated that rather formidable gentlement into yielding up a good deal more of the gains from the business he started than the 20 percent he agreed to. Petitioner, on the other hand, insists that he was a "mere investor" who received only $12,000 over his alleged initial investment of $20,000. [14] He insists that he received nothing from the business in 1971. We find this assertion incredible on the record before us. The principal witnesses were the partners, Borlaug and Stern. Unfortunately, neither of these gentlemen exhibited a marked capacity for veracity. While their testimony as to who get what is in conflict, they both agree that at the outset the split was 80/20 with Stern receiving 20 percent. We can only speculate about what adjustments *309 may subsequently have been made since their stories are in conflict. But we are morally certain that Stern received, at a minimum, the 20 percent he bargained for and was far more than a passive investor. At the criminal trial petitioner testified that "I did anything that was necessary," for the business, including taking all-night flights from Los Angeles to Baltimore. He was instrumental in procuring the needed machinery, was at risk for credit extended, and subjected himself to conflicts with the criminal law throughout 1970 and 1971. He was still involved in the business in Phoenix in 1971. We do not believe he would have continued in the business for this extended period, made the substantial effort that was required, and subjected himself to the risks involved unless he received, as a minimum, the share he originally bargained for. Certainly these activities are inconsistent with Stern's assertion that he was merely a passive investor. Additionally, petitioner has failed to recognize that, despite the absence of a formal written agreement, the income tax consequences *310 of this business are governed by the partnership provisions contained in subchapter K of the Internal Revenue Code. Cf. Paul v. Commissioner,T.C. Memo. 1957-170. For Federal income tax purposes, the term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate. * * * [Section 761(a).] The test is primarily one of intent. The key inquiry is whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Commissioner v. Culbertson,337 U.S. 733, 742 (1949). In determining whether the requisite intent existed, we may consider "all the facts--the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other *311 facts throwing light on their true intent." Commissioner v. Culbertson,supra at 742. We think it abundantly clear from the record that petitioner and Borlaug intended to conduct an enterprise jointly for profit. Accordingly, we have no difficulty in finding that AMC was a partnership for Federal income tax purposes. Partners are taxed on their distributive shares of partnership income, whether or not they actually have received a distribution from the partnership. Section 702; section 1.702-1(a), Income Tax Regs. This is the case even when a partner is unaware that partnership income has been earned, and another partner has embezzled it without his knowledge. Commissioner v. Estate of Goldberger,213 F.2d 78 (3d Cir. 1954), affg. in part and revg. in part sub nom. Trounstine v. Commissioner,18 T.C. 1233 (1952); Stoumen v. Commissioner,208 F.2d 903 (3d Cir. 1953). In Beck Chemical Equipment Corp. v. Commissioner,27 T.C. 840 at 855-856 (1957), we adhered to the rule established in Goldberger and Stoumen.
The partner's distributive share is generally determined by the partnership *312 agreement. Section 704(a). In this case, it is undisputed that petitioner and Borlaug orally agreed to a 20-80 division of profits. [15] We have not seen persuasive evidence that this agreement was modified in either of the years at issue. Accordingly, petitioner's distributive share of the partnership income was 20 percent for both years, and he is liable for Federal income tax on that amount. Issue 3. Fraud
Section 6653(b) provides that if any part of an underpayment of tax is due to fraud, an addition to tax equal to 50 percent of the total underpayment shall be imposed. Respondent bears the burden of proving by clear and convincing evidence that some part of the understatement of income for 1970 and 1971 was due to fraud. *313 Section 7454(a); Rule 142(b); Stone v. Commissioner,56 T.C. 213, 220 (1970). Fraud need not be established as to the entire amount of the underpayment; rather, if any portion of the underpayment was due to fraud, the section 6653(b) addition to tax attaches to the entire deficiency. Otsuki v. Commissioner,53 T.C. 96, 105 (1969); Shaw v. Commissioner,27 T.C. 561, 570 (1956), affd. 252 F.2d 681 (6th Cir. 1958). "The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941); Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud need not be proven by direct evidence of intention. Although fraud is never presumed or imputed, "its proof may depend to some extent upon circumstantial evidence, and may *314 rest upon reasonable inferences properly drawn from the evidence of record." Stone v. Commissioner,supra at 224. As the Supreme Court noted in Spies v. United States,317 U.S. 492 (1943), fraud properly may be inferred from certain conduct: By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. * * * [Spies v. United States,supra at 499.] As to the taxable year 1970, petitioner's criminal conviction under section 7201 (after entering a plea of not guilty), is conclusive and petitioner is collaterally estopped from denying allegations of fraud. Moore v. United States,360 F. 2d 353 (4th Cir. 1965); Tomlinson v. Lefkowitz,334 F.2d 262 (5th Cir. 1964); Stone v. Commissioner,supra; *315 Amos v. Commissioner,43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965); Plunkett v. Commissioner,T.C. Memo. 1970-274, affd. 465 F.2d 299 (7th Cir. 1972). Moreover, the record shows independent indicia of fraud sufficient to sustain the addition to tax for both years. Petitioner failed to file a proper Federal income tax return for the years in question and on the estimated tax form he did file, petitioner substantially understated his income. We are persuaded that petitioner knew that he was required to file a return, despite his argument that he believed an estimated return (Form 540) would suffice. As a former Internal Revenue Service agent who had helped others to prepare returns in prior years, petitioner was clearly aware of the requirements of the Internal Revenue laws with respect to the reporting of taxable income. [16] What is more, petitioner admitted at trial that he understood the criminal consequences of the failure to file a return.
In addition, petitioner *316 maintained direct and substantial involvement in a business that meticulously concealed its income. Most payments received were immediately converted to cash. Business records were either destroyed or concealed. Ficticious names were used to obscure the identity of the business and its principals. These activities demonstrate an ongoing purpose to conceal income and to evade taxes. Petitioner carried with him large quantities of cash, and did not deposit his income into a bank account. He has produced no records of his cash receipts. The purpose of petitioner's conduct clearly was to conceal income. See Spies v. United States,supra at 499; Furnish v. Commissioner,262 F.2d 727, 729 (9th Cir. 1958), affg. in part and revg. in part sub nom. Funk v. Commissioner,29 T.C. 279 (1957). Cf. Rosenberg v. Commissioner,T.C. Memo. 1974-10. In Remmer v. United States,205 F.2d 277 (9th Cir. 1953), vacated and remanded on other grounds 347 U.S. 227 (1954), the Circuit Court stated: A wilful intent to evade income taxes may be inferred from such factors as appellant's failure to include *317 a substantial amount of income on his and his wife's tax returns, the failure to keep adequate books which would clearly reflect income, and the concealment of the ownership of property such as a safe deposit box * * *. [205 F.2d at 288.] Here petitioner has engaged in all of these enumerated activities. His conduct convinces us of his willful intent to evade taxes. At trial, petitioner depicted himself as a man caught on the horns of a dilemma. On the one hand, petitioner claimed he was unable to file an accurate return because he lacked adequate records; on the other hand he admitted that he was aware of his duty to file a return. He claimed to have resolved his dilemma by filing estimated returns (Forms 540) in both years. He informed the Court that he expected to settle the case by subsequently reviewing his papers with the Internal Revenue Service. In the first place, we note that the failure to maintain complete and accurate records of income may be an affirmative act of fraud. Mikelberg v. Commissioner,23 T.C. 342, 353 (1954), affd. 234 F.2d 34 (3d Cir. 1956); Lollis v. Commissioner,595 F.2d 1189, 1191 (9th Cir. 1979), *318 affg. a Memorandum Opinion of this Court. In any event, however, we are not convinced that petitioner was ever truly confronted with this dilemma, because his own testimony contradicts his claim that he was unable to submit an accurate return. Borlaug maintained records of all accounts receivable. Petitioner admits that he never requested an opportunity to examine these records despite his awareness of their existence. He also knew that Fine recorded the amounts received and paid on small slips of paper. Moreover, petitioner claims to have kept records of all cash he personally received from the business, yet he did not produce those records for the benefit of this Court. We believe petitioner was capable of filing a reasonably accurate return but failed to do so in order to evade taxes he knew to be due. Accordingly, petitioner is liable for the additions imposed by section 6653(b) for fraud. Issue 4. Underpayment of Estimated Tax
Respondent's determination of additions to tax under section 6654 in presumptively correct, and petitioner bears the burden of proving that the determination is erroneous. Rule 142(a). Welch v. Helvering,290 U.S. 111 (1933). *319 Since we have found that petitioner is taxable on 20 percent of the income from the bootleg tape business in both years, it follows that he was obligated to pay estimated tax on that amount. Accordingly, petitioner is liable for the additions imposed by section 6654 for failure to pay estimated tax. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect during the years at issue, and any reference to "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure.↩
2. The parties entered into a stipulation during the course of trial that petitioner Martin Stern had income other than that derived from the bootleg tape business in the amount of $11,089.66 for 1970, and $8,089.66 for 1971.↩
3. The business was "bootleg" because it involved the deplication and sale of previously recorded music without authorization by the artists, publishing companies and record companies.↩
4. A Federal District Court sentenced petitioner to 4 years imprisonment for tax evasion, 4 years for failure to file a tax return, and 1 year for conspiracy. The terms were to run concurrently. In addition, petitioner was fined a total of $7,500.↩
5. The parties stipulated at the criminal trial that Custom Tapes made two sales in July or August of 1970, in the amount of $138.75 and $137.50.↩
6. The business venture occasionally used names other than the American Manufacturing Company, such as Tape Corporation of America, Jericho, ABC Manufacturing, and the Don Gold Company.↩
7. During the first month of operations, all profits earned by the business were used to purchase or lease equipment. Borlaug personally received all payments before Fine joined the business.↩
8. Indeed, Borlaug admitted that petitioner met with him in order to distribute a large quantity of cash that petitioner was carrying in a strong box.↩
9. Petitioner freely discussed the extent of his activities on behalf of AMC at the criminal trial: I did anything that was necessary. Like, as Mr. Robinson called up and said he needed a certain kind of tape or he needed this, I was around the people who manufactured to distributed it, so I would get it. Whatever they needed. Like, Friday night, if they wanted to make a shipment to Baltimore, I would go on a plane, fly all night to make sure there is money here for the next day, so that we could pay for the cartridges. Remember this was an expanding business. There wasn't much money around. We had to use telegrams and I flew, because to get the money in, because we had to pay immediately for everything in advance.↩
10. Petitioner has not made these records available to this Court. He did not deposit the cash he received from the bootleg tape business in his bank account because that account had been attached pursuant to a court judgment.↩
11. After trial, respondent moved for leave to file an amended answer, which would have slightly lowered the amount of net profits computed for 1970, and substantially increased the net profits for 1971. The motion was denied, and therefore the issue of whether net profits over the two years were actually higher than those alleged in the deficiency notice is not properly before us. Cf. Hackett v. Commissioner,T.C. Memo. 1970-17↩.
12. At least one check included in the calculation was made payable to the Deeds Music Company. Although respondent did not produce testimony from customers of AMC indicating that they had ever been asked to use this name, we nevertheless will permit the inclusion of the check since many of the checks made payable to Deeds Electronics were endorsed by Deeds Music Company.↩
13. Before June of 1970, Fine turned the cash over to Borlaug in petitioner's presence.↩
14. Petitioner has offered no evidence to substantiate his claim that he invested $20,000 in the business.↩
15. Petitioner claims that he "gave the business" to Fine early in 1970, yet he admits that he continued to furnish additional funds to the business and that he "did whatever was necessary" for the business in order to "protect his investment." Additionally, the record makes it clear petitioner was significantly involved into 1971 in the business. Accordingly, we find petitioner's claim that he withdrew from the partnership to be unpersuasive.↩
16. Cf.Casner v. Commissioner,T.C. Memo. 1964-277; McCarthy v. Commissioner,T.C. Memo. 1957-194↩.