NICK B. NICHOLAS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

NICK B. NICHOLAS AND CLEVONNE R. NICHOLAS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8223–74, 8224–74. Filed September 26, 1978.

*Stanley E. Jennings*, for the petitioners.
*Gregory A. Robinson*, for the respondent.

STERRETT, *Judge:* Respondent, by statutory notices dated September 9, 1974, determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Taxable year | Deficiency | Sec. 6653(a) penalty |
|---|---|---|---|
| 8223–74 | 1971 | $40,951.80 | $20,475.90 |
| 8224–74 | 1972 | 29,155.55 | 14,577.17 |
| | 1973 | 753.74 | 376.87 |

These cases were consolidated for purposes of trial, briefing, and decision. The questions presented for our consideration are as follows: (1) Whether the records used by respondent in his determination were illegally seized and, therefore, should be suppressed; (2) whether respondent correctly determined petitioners' tax liability for the years in issue; (3) whether any part of the deficiencies determined by respondent was due to fraud with the intent to evade taxes; and (4) whether Clevonne R. Nicholas qualifies as an innocent spouse for the taxable years 1972 and 1973. Respondent conceded on brief that Nick B. Nicholas was a resident alien during the years in issue.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners, Nick B. Nicholas (hereinafter Nick), and Clevonne R. Nicholas (hereinafter Clevonne), were married February 26, 1972, and were husband and wife at the time of filing the petitions herein. Nick filed an individual Federal income tax return for the calendar year 1971. Petitioners filed joint Federal income tax returns for the calendar years 1972 and 1973. Petitioners resided in Poway, Calif., at the time the petitions herein were filed.

Nick was previously married to Stella M. Nicholas. Five children resulted from that marriage. Nick separated from Stella M. Nicholas at the time he entered the United States. Their divorce was finalized on February 2, 1972. Both Nick's former wife and the five children resided in the Bahamas. Clevonne also had children by a prior marriage. Her two boys reside with petitioners. Nick and Clevonne have one child of their union, born in 1973.

From at least September 1967 until February of 1969 Nick worked for the Ford Motor Co. at the Dearborn engine plant. He started as a pin grinder and had progressed to a job setter by the time his employment therewith terminated. Nick also worked at the House of Leather, Inc., and for Northwestern Dodge, Inc., as a salesman during 1969. His earnings from such occupations in 1969 totaled $5,196.76.

During 1970 Nick continued employment with Northwestern Dodge, Inc., until the summer of that year. After terminating employment therewith he attempted some promotional work in the entertainment field. His only reported income for 1970 was from Northwestern Dodge, Inc., in the amount of $6,512.51.

Nick reported income of $10,000 in 1971 as amounts received from gambling. In 1972 he reported $20,000 from the same source plus interest income of $1,469. He reported no income for 1973. During both 1972 and 1973 petitioner was engaged in horseracing. However, in both years he reported deductions therefrom in excess of income.

Even before their marriage Clevonne and Nick comingled their assets. Clevonne worked for the Detroit Chamber of Commerce until mid-1971. Her annual salary fell between $5,000 and $6,000 per year.

In August of 1970 Nick purchased a residence in Detroit, Mich., for $20,700. The application for mortgage approval under F.H.A. financing for the total sales price reflected total assets of $12,050 and $0 liabilities as of August 12, 1970.

The August 12, 1970, financial statement reflected ownership by Nick of one car, a 1962 Ford, valued at $250. He had previously owned a number of cars. In 1965 he had purchased a Mustang on time. The Mustang was traded in on a Toronado in 1967. Nick made payments on the Toronado until it was traded in on the purchase of a 1968 Thunderbird. In turn the Thunderbird was traded in for a 1969 El Dorado Cadillac. The

difference in price between the Thunderbird and Cadillac, approximately $1,500, was financed. The Cadillac was repossessed and auctioned off in 1969. Nick then purchased a Lincoln Mark III for $8,300 cash. This car was sold in 1971.

In January of 1971 Clevonne purchased a 1969 El Dorado Cadillac. A downpayment of $2,024.40 was made, all or part of which was derived from a trade-in. The balance, $3,404.59, was paid February 15, 1971. Clevonne acquired a 1972 El Dorado in September of 1971. At that time Nick acquired a Fleetwood Cadillac. Both cars were purchased for cash. The El Dorado was used as a trade-in on a 1971 Rolls Royce in August of 1972. The difference, approximately $13,200, was paid in cash. In 1973 Nick acquired another Rolls Royce partially in exchange for the 1970 Rolls which was damaged under warranty plus a difference of $1,114 cash.

The record discloses that Nick made numerous cash transactions during the years in issue. As they are relatively small in amount we will not list such dealings in detail. In addition to such transactions, on two or three occasions in the spring and summer of 1971 Nick visited each of two cashiers at Manufacturers National Bank in Detroit to exchange 5-, 10-, and 20-dollar bills for 100 dollar bills. The amount exchanged ranged from $3,000 to $10,000. On one occasion he exchanged $14,000.

On July 15, 1971, Nick purchased a residential lot in San Diego County, paying $14,000. The next day he obtained an initial estimate of $43,650 from McCorquodale Builders Inc. for the construction of a house on that lot. A pool was installed by McCorquodale Builders Inc. and the lot was landscaped. Apparently the total construction cost, including landscaping, was approximately $52,000. In addition an interior decorator was employed at a cost of $10,000.

Nick purchased the following horses for cash:

| Date | Horse | Amount |
|---|---|---|
| 11/20/72 | Calico Cat | $5,500 |
| 11/20/72 | Sappho | 23,500 |
| 11/21/72 | Night Jet | 6,700 |

He also made a cash deposit of $7,000 to Eagle Downs Racing Association in each of the taxable years 1972 and 1973 and one of $500 in 1972.

Nick reported income from gambling in the amounts of

$10,000 and $20,000 for his taxable years 1971 and 1972, respectively. During 1971 he made three trips for the purpose of gambling and went to the horse races approximately 20 times. He had no method of recording wins and losses in that year.

During 1972 Nick placed his winnings in an account for purposes of keeping track of his gambling wins and losses. The account reflects only two deposits but withdrawals throughout 1972 and 1973. In 1972 he made three or four trips to Las Vegas. In March 1972 he won $50,000. He also bet on the horses. He reported a net profit of $20,000 from his 1972 gambling activities. Nick made one trip to Las Vegas in 1973 but did not gamble during that trip. He also made a few dollars playing golf, but did not make any large bets. He accumulated his gambling winnings at home.

On June 12, 1974, a search warrant was issued by the United States District Court for the Southern District of California. The warrant authorized a search of petitioners' premises for "heroin, cocaine, and other dangerous drugs, packaging materials, scales, business records, cash, and other physical and documentary items relating to the possession, distribution and sale of narcotics and dangerous drugs." Pursuant to the warrant a search was conducted on June 21, 1974, by a special agent of the Drug Enforcement Administration of the Department of Justice. In addition to the illicit drugs and their accouterments the agents confiscated petitioners' financial records.

At that time the drug enforcement agent contacted a special agent with the Intelligence Division of the Internal Revenue Service. After the documents seized by the drug enforcement agents were reviewed copies were turned over to the Internal Revenue Service.

Nick admitted purchasing what he believed to be 1 pound of cocaine in 1974 for $9,000. He testified that he sold 15 tablespoons (approximately 3 ounces) for $2,700. He also personally used some of the cocaine. When Nick was arrested on June 21, 1974, the inventory reflected, among other items, possession of cocaine, plastic baggies, and spoons. The subsequent complaint reflects that the total amount of cocaine in his possession was approximately 1 pound.

Clevonne took a major role in the family bookkeeping. She signed a majority of the checks written by petitioners and kept

the financial records. She compiled receipts in preparation for filing their tax returns.

## OPINION

### Issue 1. Search and Seizure

Petitioners contend that the personal records used by respondent in his determination of tax liabilities were illegally seized and, therefore, should be suppressed. Petitioners consider the warrant to have been defective on its face as overbroad and the documents seized not to be covered by the warrant.

The Fourth Amendment prohibits general exploratory searches. Therefore, to be valid, a search warrant must particularly describe the items seized. *Marron v. United States*, 275 U.S. 192, 196 (1927). Illegally seized items have been suppressed as evidence as a means of assuring the prohibition of general exploratory searches. *United States v. Janis*, 428 U.S. 433, 446 (1976).

When the items seized were submitted as evidence of illegal acts other than those for which the warrant was procured, the Supreme Court tested the validity of the warrant by inquiring whether the warrant authorized only a search for and seizure of evidence relating to the crime for which the warrant was obtained. *Andresen v. Maryland*, 427 U.S. 463, 480 (1976). To determine whether the evidence obtained in the search was admissible as evidence of another crime it was examined in connection with the purpose behind the warrant for "cause to believe that the evidence sought [would] aid in a particular apprehension or conviction." *Andresen v. Maryland, supra* at 483.

Herein, the warrant was issued in connection with illicit drug dealings. The warrant authorized a search for and seizure of illegal drugs, their accouterments, and the business records and documentary items relating thereto. We do not find such authorization to be overbroad. Compare, *Andresen v. Maryland, supra* at 480, n. 10; and *United States v. Joseph*, 174 F.Supp. 539, 544 (E.D. Pa. 1959), affd. 278 F.2d 504 (3d Cir. 1960), cert. denied 364 U.S. 823 (1960). The affidavit for search warrant reflects suspected ties with organized crime in Detroit, Chicago, New

York, and Philadelphia. The investigator seized petitioners' financial records for the purpose of proving this association.[1] It is apparent, therefore, that there was cause to believe that the documents seized would aid in Nick's conviction.

Petitioners contend that, because the financial records were "mere evidence" of a crime rather than fruits, instrumentalities, or property illegally possessed, they must be supressed as evidence. However, the distinction between "mere evidence" and "fruits, instrumentalities, or contraband" was held to be no longer viable in *Warden v. Hayden*, 387 U.S. 294, 310 (1967).

We find the evidence submitted was lawfully seized and, therefore, properly before the Court.[2]

### Issue 2. Petitioners' Tax Liability

Respondent, in his notices of deficiency,[3] determined that petitioners had unreported taxable income for the years in issue as follows:

| Year | Unreported taxable income |
|------|---------------------------|
| 1971 | $91,076.00 |
| 1972 | 69,052.28 |
| 1973 | 21,802.76 |

He based his calculations on the bank deposits and cash expenditures method of reconstructing income.

Petitioners claim that respondent overlooked the following nontaxable sources of income for the years in issue:

| Year | Amount | Source |
|------|--------|--------|
| Pre—1971 | $20,000 | Brought into country on arrival |
| 1971 | 80,000 | Loan from brother |

---

[1]The investigation resulted in Nick's conviction under the conspiracy charge described in 21 U.S.C. sec. 846.

[2]With respect to this issue *Suarez v. Commissioner*, 58 T.C. 792, 814 (1972), is distinguishable. In *Suarez* the Court suppressed evidence that had been illegally seized.

[3]Respondent's motion for leave to amend his answer filed Apr. 29, 1977, was granted. Therein respondent amended his calculations to reflect his assertion that Nick was an illegal alien. On brief respondent conceded Nick's resident alien status.

| 1971[1] | 20,000 | Gift from mother |
| 1972 | 15,000 | Loan from friends |
| 1972 | 7,000 | Incorrectly credited to his account by trainer |
| 1973 | 7,000 | Incorrectly credited to his account by trainer |

---

[1] Or two cars which together cost approximately $20,000.

Section 6001 requires taxpayers to maintain records which are sufficient to "show whether or not such person is liable for tax." If the taxpayer fails to keep records respondent may resort to other means of determining income. Sec. 446(b). Nick made numerous bank deposits and cash expenditures from undocumented sources. Respondent's use of the bank deposits and cash expenditures method of calculating income under such circumstances has been approved. *Harper v. Commissioner*, 54 T.C. 1121, 1129 (1970) and cases cited therein. Once respondent has determined that unexplained deposits and expenditures constitute income, the burden of proving his determination erroneous rests with petitioners. *Harper v. Commissioner, supra.*

Petitioners offer no documentary support for any of the claimed nontaxable sources. They claim that the moneys received were all in cash form and that all loan transactions were entirely verbal. With respect to the $80,000 they offered as corroboration the written depositions of Nick's mother and brother, neither of whom were willing to appear before the Court to testify and the testimony of Clevonne, who contends that she brought $80,000 undeclared cash into the country. Both Nick's mother and brother were vague with respect to dates, amounts, and terms of intrafamily monetary transactions. We are not required to accept the petitioners' implausible testimony which is uncorroborated by documentary evidence. *Gatling v. Commissioner*, 286 F.2d 139, 143 (4th Cir. 1961).

Respondent, through documentation of petitioners' bank deposits and cash expenditures,[4] has provided substantial proof that petitioners had unreported income of at least the amounts determined in the statutory notices. He has established a likely source of unreported income, gambling, capable of generating substantial receipts in excess of those reported. See *Holland v. United States*, 348 U.S. 121, 138 (1954).

Prior to 1971 Nick's standard of living does not reflect sources of income other than from his regular job. His explanations leave many unanswered questions. His mortgage application dated August 12, 1970, does not reflect the existence of a large amount of available cash. The subsequent financial statement fails to disclose either an available cash hoard or significant debt.

Although Nick's expenses were modest in the years prior to those in issue, there are no indications that he accumulated the funds that were expended during the years in issue. During prior years Nick not only supported himself, but also his then wife and five children who resided in a separate household located in the Bahamas.

Nick's practice of purchasing cars on time is a further indication that excess funds were not available for his use. This practice abruptly changed in 1971.

Based on all the facts and circumstances we find that petitioners had unreported income for the taxable years in issue of at least the amounts determined in the statutory notices.

### Issue 3. Fraud

Respondent must show by clear and convincing evidence that a part of each year's deficiency is due to fraud. Sec. 6653(b); Rule 142(b), Tax Court Rules of Practice and Procedure. Because direct proof of an intent to defraud is seldom possible respondent may show fraud through the transactions and conduct of the taxpayer. *Papineau v. Commissioner*, 28 T.C. 54, 58 (1957).

Nick was aware of his duty to file an accurate statement of his income. At one time he incorrectly listed his marital status. His mistake resulted in a conference with the IRS and payment of a

---

[4]For example: the purchase of three horses in November of 1972 for a total of $35,200 cash plus three cash deposits to two racing associations in 1972 and 1973 totaling $14,500 and the purchase of two Cadillacs for $19,934 cash in September of 1971 and a Rolls Royce in August of 1972, the former for cash and the latter for a trade-in plus approximately $13,200.

deficiency. Both Nick and Clevonne knew that maintenance of records substantiating donations and interest was required. Petitioners understood that the recordkeeping requirement encompassed gambling wins and losses, yet they failed to submit records of his gambling wins and losses from which his gambling income could be ascertained. Lack of adequate records can be interpreted as an indicia of fraud. *Mikelberg v. Commissioner*, 23 T.C. 342, 353 (1954), affd. 234 F.2d 34 (3d Cir. 1956), cert. denied 352 U.S. 968 (1957). Nick dealt extensively in cash. In addition, he exchanged 5-, 10-, and 20-dollar bills for 100 dollar bills at Manufacturers National Bank in Detroit at least four times during the spring and summer of 1971. The smallest amount exchanged was at least $3,000. On one occasion he exchanged at least $10,000 while on another he exchanged $14,000. Such dealings heighten the effect of inadequate recordkeeping. *Davis v. Commissioner*, T.C. Memo. 1956–206, affd. 249 F.2d 69 (4th Cir. 1957). We have found that petitioners consistently omitted substantial amounts of income during the years in issue. *Bender v. Commissioner*, 256 F.2d 771, 774 (7th Cir. 1958).

Petitioners' financial statements submitted to obtain credit controvert their testimony of a substantial cash hoard and an $80,000 loan. Nick's testimony with respect to the purchase of two horses by C.N. Stables was inconsistent with his previous statements made to the internal revenue special agent. His testimony with respect to his continued reporting of his status as a surviving widower even after the conference with the IRS and payment of a deficiency due to his prior claim of such status stretches our imagination. Nick's testimony also fails to elucidate the reason for his claim of personal exemption deductions during the years in issue for his five children who lived in the Bahamas with their mother. Such inconsistencies are a factor to be considered when determining the existence of fraud. See *Gatling v. Commissioner, supra*.

Based on all the facts and circumstances we find that a portion of each year's deficiency herein was due to fraud.

### Issue 4. Innocent Spouse

Under section 6013(e) a spouse is considered to be innocent of wrongly omitting income even though she joined in the filing of a return under section 6013(a) if three prerequisites are met: (1) The income found to be omitted is attributable to the other

spouse; (2) the spouse did not know, and had no reason to know, of the omission; and (3) after considering all facts and circumstances and whether the spouse derived a significant benefit from the omitted income it is inequitable to hold the spouse liable for the deficiency arising due to the omission.

Clevonne joined in the filing of returns for 2 of the years in issue. Although the record indicates that the returns were prepared by professionals, it also indicates that she was knowledgeable of the status of family finances and, in fact, played an active role in keeping the financial records.

Clevonne also significantly benefited from the increased wealth. Petitioners' standard of living was in line with their income. A new home with a pool was built to Nick's specifications. Petitioners acquired a Rolls Royce. They made trips. Nick purchased jewels for Clevonne during the years in issue.

We find that Clevonne fails to satisfy the conditions set forth in section 6013(e)(1)(B) and (C) and, therefore, fails to qualify as an innocent spouse. *Sonnenborn v. Commissioner*, 57 T.C. 373, 381 (1971).

*Decisions will be entered for the respondent.*