RAYMOND MADDOX and KATIE MADDOX, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Maddox v. Commissioner
Docket No. 13397-81.
United States Tax Court
T.C. Memo 1983-423; 1983 Tax Ct. Memo LEXIS 368; 46 T.C.M. (CCH) 809; T.C.M. (RIA) 83423; July 21, 1983. Raymond Maddox, pro se. Elizabeth S. Henn, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent asserted deficiencies against petitioners Raymond and Katie Maddox of $4,718.75 and $2,964.05 for the taxable years 1973 and 1974, respectively, and section 6653(b) [1] additions to tax solely against petitioner Raymond Maddox of $2,620.37 and $1,621.53 for 1973 and 1974, respectively. Two issues are presented for our decision: (1) whether petitioners had unreported income from "running" in 1973 and 1974 and, if so; (2) whether petitioner Raymond Maddox's failure to report such income *369 was due to fraud, [2] with intent to evade his lawfully owed taxes. FINDINGS OF FACT Petitioners Raymond and Katie Maddox (petitioner husband is hereinafter referred to as Raymond) resided in Baltimore, Maryland, when the petition in this case was filed. Raymond is well educated. He has about 200 credits in college-level courses which include credits in automobile insurance law, and he has fairly good knowledge of the law and the workings of the criminal justice system. In 1970 Raymond began working for various attorneys as a runner. As such, Raymond monitored a police radio to learn the location of traffic accidents. Upon learning of an accident, Raymond immediately traveled to the scene of the accident and attempted to persuade the persons involved therein to retain one of the attorneys for whom Raymond worked. Raymond was paid a referral fee for each case he referred to an attorney. Raymond operated his running business in partnership with Wiley Hill (hereinafter Wiley) until mid-1974. Raymond and Wiley *370 evidently shared profits and losses evenly, although from Raymond's testimony it is impossible to determine how the partnership accounts were settled. In 1974 some of the lawyers for whom Raymond worked as a runner became subjects of a Federal investigation known as "the doctors and lawyers investigation." The investigation focused on the filing of fraudulent insurance claims for personal injury. During this investigation, Raymond was identified as possessing relevant information. Raymond had several meetings with Federal prosecutors, and eventually agreed to provide information in exchange for immunity. On June 5, 1974, an order was issued granting Raymond immunity from criminal prosecution. [3]
*371 During 1973 and 1974 Raymond was employed by the City of Baltimore. He reported his earnings from this job on his 1973 and 1974 returns. Raymond reported no income from his 1973 and 1974 running activity, but he did report such income on his 1970, 1971 and 1972 joint returns, although it was falsely reported as income earned as a claims adjuster, rather than as income from running. On the 1970 return, Raymond reported gross receipts attributable to running of $7,580, and net running income of $4,327. On the 1971 return he reported gross receipts attributable to running of $20,000, and net running income of $9,300.61. On the 1972 return, Raymond reported gross receipts attributable to running of $16,492.50, and net running income of $8,812.83. During 1973 and 1974, petitioners maintained bank accounts at Municipal Employees Credit Union of Baltimore, Inc., and Provident Savings Bank (hereinafter Provident). In 1973 Raymond purchased a used boat for $5,500, of which $1,000 was paid by check; the remainder was paid in cash. In his deficiency notice, applying the bank deposits and cash expenditures method, respondent computed Raymond's unreported gross income for 1973 *372 and 1974 as follows: 1973
Total currency deposited
$18,136.20
Total checks deposited
2,238.73
Total deposits
20,374.93
Cash payment for boat
4,500.00
Total
24,874.93
Less: possible sources of funds--
Payroll checks
664.77
Bonds
468.75
Reimbursement from Wiley Hill
874.04
Withdrawals from Credit Union
3,000.00
5,007.56
Subtotal
19,867.56
Less: Allowable operating expenses
874.04
Unreported Gross Income
18,993.33
1974
Total currency deposited
15,300.50
Total checks deposited
2,695.57
Total deposits
$17,997.07
Less: Payroll checks
988.47
Bonds
243.75
Insurance proceeds
905.00
Reimbursement from Wiley Hill
1,025.01
Withdrawals from Credit Union
1,550.00
Total
4,712.23
Subtotal
13,284.84
Less: Operating expenses
1,025.01
Unreported Gross Income
12,259.83
Raymond borrowed $9,800 from Midtown Savings and Loan Association, Inc. (hereinafter Midtown), in March 1975. He did not receive any loan proceeds from Midtown in 1973 or 1974. On January 4, 1978, Raymond was convicted of possession of a firearm by a convicted felon, in violation of 18 U.S.C., section 1202 (1970). *373 On May 16, 1978, Raymond was convicted of second-degree murder. He was serving a 30-year sentence for this crime at the time of the trial in this case. On December 28, 1978, Raymond was convicted of mail fraud in violation of 18 U.S.C., sections 1341 and 1342 (1970). Raymond did not provide respondent with records adequate to determine his running income, or discuss his running activities with respondent's agents prior to the determination of the deficiency in this case. OPINION Issue 1. Unreported Running Income
Respondent computed the deficiencies in this case using the bank deposits and cash expenditures method. This method is a permissable method of computing the income of a taxpayer who fails to keep adequate books or records. Estate of Mason v. Commissioner,64 T.C. 651, 656-657 (1975), affd. 556 F.2d 2 (6th Cir. 1977); Nicholas v. Commissioner,70 T.C. 1057, 1064 (1978). Petitioners bear the burden of proving that the deficiency determined by respondent using the bank deposits and cash expenditures method is incorrect. Rule 142(a); Estate of Mason,64 T.C. at 657. Raymond *374 concedes that he had some unreported running income in 1973 and 1974, but contends that his unreported income for each of those years was less than the amounts determined by respondent. Raymond contends, as best we can understand him, that in March 1973, the Federal investigation into insurance fraud became widely known and talked about in the running community, and that as a consequence of this he and his partner Wiley terminated their practice of going personally to accident scenes, and instead began to acquire cases to refer to attorneys by buying them from runners who were still willing to meet with accident participants at the scenes of accidents. Raymond seems to be contending that respondent failed to allow him credits for amounts paid to purchase cases from other runners. According to Raymond, half of his gross running income in 1973 and 1974 was used to purchase cases from other runners. On cross-examination, respondent asked Raymond to provide more details concerning the payments he claimed to have made to acquire cases. Raymond's response was vague, [4] and he failed to produce any witnesses willing to testify that they were paid for cases by Raymond. On this record, *375 we find and hold that Raymond's unsubstantiated, vague and self-serving testimony that he incurred expenses to purchase cases in 1973 and 1974 does not suffice to carry his burden of proof on this point. Raymond also contends that he kited checks in 1973 and 1974, and that many of the deposits to his account with Provident in 1973 and 1974 are attributable to check kiting. [5]
*376 Our examination of Raymond's Provident deposit receipts for 1973 and 1974 disclosed few instances in which several checks for the same amount were deposited within three days of each other, a pattern we found indicative of check kiting in Estate of Mason,64 T.C. at 661. In particular, we were unable to discover any pattern of deposits consistent with Raymond's testimony that he frequently kited, e.g., a $200 check for several weeks by making numerous $200 deposits in succession. Taking into consideration the record before us, our evaluation of Raymond's credibility as a witness, and his failure to point to any specific instances of check kiting, [6] we find and hold that Raymond has failed to carry his burden of proving that any of the deposits to his Provident account are attributable to kiting.[7]
*377 Since Raymond has failed to meet his burden of proof with respect to respondent's calculation of his unreported income for 1973 and 1974, respondent's determinations must be upheld. Issue 2. Fraud
Fraud is the intentional evasion of a tax believed owed. McGee v. Commissioner,61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976). In order to prove that an underpayment is due to fraud, respondent must prove, by clear and convincing evidence, that petitioner had the specific purpose and intent to evade a tax believed owed, and that the underpayment of tax was due to, or caused by, the intent to evade tax. Sec. 7454(a); Rule 142. Petitioner contends that because he believed his 1974 immunity agreement exempted him from Federal income taxation of his 1973 and 1974 running income, his failure to report that income in 1973 and 1974 was not based upon an intent to avoid tax believed owed. After a careful review of the record, we find incredible Raymond's assertion that he believed his immunity agreement with the Federal prosecutors absolved him of his obligation to pay tax on his running *378 income. The District Court order granting immunity to Raymond contains no language whatsoever to the effect that Raymond's 1973 and 1974 running income was exempt from Federal tax, nor does Raymond contend otherwise. Raymond contends that exemption from tax was promised him orally by one of the Federal prosecutors with whom he met concerning his role in the doctors and lawyers insurance fraud investigation. [8]
James Marshall Kramon, a former Federal attorney, was present at the meetings described by Raymond. According to Kramon's testimony, in none of the meetings with Federal prosecutors did Raymond raise the issue of income tax liability related to his running activities. Kramon further testified *379 that he would have been unable to give any immediate response had Raymond asked about tax liability for his 1973 and 1974 running income. This directly contradicts Raymond's testimony that he received a positive response immediately following his inquiry concerning his liability for taxes on his running income. In view of Raymond's education and knowledge of the law, and his understanding that running income was taxable, as evidenced by his reporting it in 1970, 1971 and 1972; and based on our evaluation of the credibility of Kramon and Raymond, and the entire record, we conclude that during the doctors and lawyers investigation Federal prosecutors never made any statement to Raymond that he could reasonably have construed as granting him exemption from Federal tax on his 1973 or 1974 running income. Accordingly, we find that Raymond did not believe when he filed his 1973 and 1974 returns that Federal prosecutors had arranged to make his running income for those years exempt from Federal tax. Under these circumstances we are satisfied that Raymond knew that his running income for 1973 and 1974 was taxable. We find and hold therefore that respondent has met his burden of proving *380 that Raymond failed to report his 1973 and 1974 running income with the intent of evading a tax believed owed. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Katie Maddox is a party in this case solely because she filed a joint return with Raymond. Respondent is not asserting the fraud addition against her.↩
3. The order read as follows: IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
IN THE MATTER OF A GRAND JURY WITNESS ORDER
On motion of George Beall, United States Attorney for the District of Maryland, and David M. Soutar, Special Attorney, United States Department of Justice, filed in this matter on the 5th day of June, 1974; And it appearing to the satisfaction of the Court: 1. That Raymond Maddox has been called to testify in the above matter and has refused to testify on the basis of his privilege against self incrimination under the Fifth Amendment to the Constitution of the United States. 2. That in the judgment of the United States Attorney for the District of Maryland, the testimony from the said Raymond Maddox is necessary to the public interest. 3. That the aforesaid application filed herein has been made with the approval of the Assistant Attorney General in charge of the Criminal Division of the Department of Justice, pursuant to the authority vested in him by 18 U.S.C. 6002-6003 and 28 C.F.R. 0.175. NOW, THEREFORE, IT IS ORDERED, in accordance with the provisions of Title 18, United States Code, Section 6003, that Raymond Maddox, a witness, be and is hereby required to give testimony in the above matter. It is further Ordered that Raymond Maddox, a witness, may not be excused from testifying as required of him on the ground that the testimony required of him may tend to incriminate him or subject him to a penalty or forfeiture. No testimony or other information he shall give under this Order, however, may be used against him in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the Order.↩
4. Q Now you've testified that you had to "buy cases." A What? Q You had to "buy cases." A Yeah, we bought cases. Q Can you name any of the individuals who you bought cases from? A Oh, I can't, I don't know them by name. Diamond Jim, Toliver, these guys are street guys, I don't really know their names and addresses. A lot of cab drivers.↩
5. He testified as follows: And this gentleman that testified about me about Provident Savings, about the deposits being made there. That account, in 1974 that account was closed out. As a matter of fact, it was terminated because at the time we had so many checks bounce because, as I tried to explain to Ms. Henn, that many trying to determine my income from that deposits that I was making, it just can't be done, because many of the deposits that I was making were for floating checks, and floating checks meaning that sometimes you have a check floating that is if you don't have the money you have to sometimes make the same deposit to cover the same check four or five times. In other words, you cash one check for $200.00 and if you don't have the $200.00 to make that check good, you got to cash another check to make that one good, and cash another one to make that one good. And that can go on sometimes a couple weeks, and you're depositing the same $200.00 all the time.↩
6. Q Were all the checks that you wrote to cash to cover other checks? A I'm saying that out of a total of $18,000.00, it's hard to say how much of that that might have been just covering the same check. I mean between Wiley Hill and I, I mean like you make a check for $200.00 and you don't make the money to make it good, you cash another check to make that check good. ↩
7. Raymond at various points makes two other arguments that are easily disposed of. On brief, Raymond contends that the cash he paid to purchase a used boat in 1973 was derived from the earlier sale of a boat owned by Raymond. Since Raymond failed to testify concerning this alleged sale, no evidence on this matter is properly before us and we cannot consider Raymond's argument. Additionally, at trial Raymond testified that he received a $10,000 loan from Midtown Savings and Loan in 1974. Raymond concedes on brief that he actually received the loan (in the amount of $9,800) from Midtown Savings and Loan in 1975.↩
8. And I specifically asked them at that time, I said, "Well, what about the Internal Revenue?" And I was told by Mr. Kramon and one of his associates that "any money you made pertaining to this investigation is dead, you don't have to worry about that." And that is why that I did not worry about '73 and '74 income tax returns because, like I always file two years in a row. I always file, ever since I've been filing taxes, I file two years together. So I didn't worry about it.↩