SAMUEL FAME and LORRAINE FAME, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fame v. Commissioner
Docket No. 7308-79.
United States Tax Court
T.C. Memo 1983-421; 1983 Tax Ct. Memo LEXIS 366; 46 T.C.M. (CCH) 794; T.C.M. (RIA) 83421; July 21, 1983. Jack M. Battaglia, for the petitioners. Edward D. Fickess, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax: Addition to Tax
Year
Deficiency
Sec. 6653(b) [1]
1965
$2,463.07
$1,231.54
1966
7,650.46
3,825.23
1967
10,611.50
5,305.75
1968
30,461.29
15,230.65
Respondent concedes that in the absence of fraud the period of limitations on assessment for all taxable years involved herein has expired. Petitioners concede that their taxable income was understated in each of the taxable years involved. Consequently, the only issue for decision is whether any part of the underpayment *367 of tax was due to fraud. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Samuel Fame and Lorraine Fame, husband and wife, resided in Rochester, New York, when they filed their joint Federal income tax returns for the years in issue and when they filed their petition in this case. During 1942 through February of 1945, Samuel Fame (hereinafter petitioner) attended high school in Rochester, New York. In March of 1945, petitioner, prior to completing his final year of high school began serving in the United States Army Air Force, and he was honorably discharged therefrom in 1947. [3]
Upon leaving the armed services, petitioner pursued many different opportunities in his search *368 to establish a livelihood. During 1947 and 1948, petitioner enrolled in air conditioning and refrigeration courses that were being given at Alfred University in Alfred, New York. From 1949 through 1951, petitioner was employed as a factory worker for the Richardson Corporation in Rochester, New York, and during such period he obtained a real estate license in his spare time. From 1951 through 1957, petitioner was employed as a pipefitter for a company known as Taylor Instruments. In 1955, petitioner graduated from the Rochester Institute of Technology, receiving an associates degree in electrical engineering. Sometime prior to 1965, petitioner became a full-time life insurance agent for the Metropolitan Life Insurance Company in Rochester, New York. During the years in issue, petitioner engaged in a variety of business and investment activities. For the sake of clarity, we shall discuss such activities separately, beginning with petitioner's insurance business. Insurance Business
In 1965, petitioner began selling casualty and life insurance. During the years in issue, petitioner was the general agent in Rochester, New York, for the United States Life Insurance Company *369 (hereinafter U.S. Life). As a general agent for U.S. Life, petitioner would place insurance policies with that company for his own customers and customers of other insurance salesmen. U.S. Life would pay petitioner commissions based on such business, which petitioner in turn forwarded to those insurance salesmen who had placed policies through his agency. [4]
In addition to U.S. Life, petitioner also sold insurance, during the years in issue, for the United States Fidelity and Guarantee Company (hereinafter Fidelity) and the Indiana Lumberman's Mutual Company (hereinafter Indiana Lumberman's). During 1965 through *370 1968, petitioner received insurance commission income in the following amounts from Fidelity and Indiana Lumberman's: [5]
Year
Company
Amount
1965
Fidelity
$2,359.17
Indiana Lumberman's
571.51
1966
Fidelity
2,534.26
Indiana Lumberman's
849.76
1967
Fidelity
1,886.43
Indiana Lumberman's
1,275.93
1968
Fidelity
562.01
Petitioner did not maintain formal records documenting every item of income and expense generated by his insurance business. Consequently, petitioner's return preparer, Anthony Moscaritolo [6] (hereinafter Moscaritolo), had to depend, to some extent, on numbers furnished to him by petitioner. Petitioner, however, did submit whatever records he had whenever Moscaritolo asked to check an amount for purposes of substantiation. The records which petitioner furnished to Moscaritolo *371 included Form 1099's from U.S. Life, expense records, bank statements, cancelled checks, and check stubs. [7]
*372 Petitioner's Federal income tax returns for the years in issue included schedules which reveal, inter alia, the following information with respect to petitioner's total receipts from his insurance business, the cost of doing such business, and the net profit therefrom: Year
Total Receipts [8]
Cost of Doing Business
Net Profit
1965
$18,773.55
$15,732.62
$3,040.93
1966
15,712.65
13,162.74
2,549.91
1967
14,468.57
10,470.15
3,998.36
1968
17,309.12
16,126.94
1,182.18
Rental Properties
From 1965 through 1968, the number of rental properties owned by petitioner varied between 10 and 14. With respect to some of those properties, petitioner owned only a one-half interest. Petitioner did not maintain *373 formal and complete records for his rental properties. He did, however, maintain folders for such properties in which he made notations showing the total number of rental units, the number of months that they were rented, the monthly rental received for each unit, and the expenses incurred on a particular piece of property. Petitioner supplied those folders to Moscaritolo, who in turn used the information contained therein to help him prepare petitioner's Federal income tax returns. To the extent that petitioner's records were incomplete for a given period, Moscaritolo, with petitioner's assistance, would estimate the rental income for the period by taking into account the number of rental units available, the rent for each unit, and the estimated number of vacancies. [9]
On his Federal income tax returns for the years in issue, petitioner attached schedules showing that he incurred the following *374 losses from his rental properties: Year
Loss
1965
$764.99
1966
3,336.06
1967
2,303.57
1968
3,320.32
Horse Farm
In 1965, petitioner formed, with another individual a partnership called Pardee Acres, which owned a horse farm. During the years in issue, petitioner was a 50 percent partner in Pardee Acres and his capital account in the partnership reflected the following amounts: Year
Capital Account
December 31, 1965
$4,219.01
December 31, 1966
5,816.01
December 31, 1967
4,655.62
December 31, 1968
3,687.32
All recordkeeping with respect to the partnership's operation was maintained by petitioner's partner. Petitioner's 1965 Federal income tax return shows that Pardee Acres incurred a loss of $3,482.08 for such year and that petitioner claimed one-half of that loss (i.e., $1,741.04) on that return. Subsequent to 1965, petitioner began having problems with his partner in the horse farm venture and he was unable to obtain all of the financial records of Pardee's operations in time for the preparation of his income tax returns. Petitioner had informed Moscaritolo that he believed that Pardee Acres had also operated at a loss *375 for 1966, 1967, and 1968, but since they were unable to obtain all of the financial records of the partnership prior to the dates that petitioner filed his returns for those years, no losses were claimed on such returns. [10] Consequently, no losses were claimed with respect to petitioner's interest in Pardee Acres on his returns for 1966, 1967, and 1968. Tavern Business
From December 1965 through 1968, petitioner's wholly owned corporation, Octave Enterprises, Inc. (hereinafter Octave), owned and operated a tavern located at 302 University Avenue, Rochester, New York. [11] The tavern consisted of a bar and restaurant, and was operated under the name of the Loop Lounge. *376 Throughout the years in issue, petitioner performed various services for Octave in connection with the operation of its tavern. He supervised the collection of customers' payments, and he personally counted the daily bar receipts. Petitioner maintained a separate checking account for Octave, and he made all of the deposits to that account and he wrote all of the checks issued therefrom for payment of Octave's expenses. In exchange for those services, petitioner received wage payments from Octave in the amounts of $5,400 and $7,800 during 1967 and 1968, respectively. Petitioner's 1967 Federal income tax return showed such $5,400 in wages, but the aforementioned $7,800 in wages was not reported on petitioner's 1968 return. From December 1965 through 1968, petitioner was extremely busy operating his insurance business and the tavern, maintaining his rental properties, and trying to look after his horse farm (Pardee Acres). Petitioner's insurance business was located 3 or 4 buildings away from Octave's tavern, and he was attempting to run the insurance business and the tavern at the same time. Often, petitioner would be working at his insurance office when a problem at the tavern *377 would arise requiring his immediate attention. General Background
Petitioner neglected to keep complete records of his business and investment activities. As petitioner's business and investment activities increased, he failed to organize his records in a manner conducive to good recordkeeping. His office was in a state of disarray; there were papers, folders, advertising circulars, and files strewn all over the office. The records which petitioner did maintain, were in large part the result of Moscaritolo's urging. At Moscaritolo's insistance, petitioner did maintain a Dome Simplified Weekly Bookkeeping System [12] for the tavern business which he operated through Octave. Generally, however, Moscaritolo considered petitioner's informal recordkeeping to be substantial. Petitioner always cooperated with Moscaritolo in the preparation of his returns. Such cooperation included making checkbooks, cancelled checks, 1099 Forms, and other records available to Moscaritolo whenever he wanted substantiation for a particular item. Moscaritolo has known petitioner since *378 1950, and from that time through 1968, has prepared petitioner's Federal income tax returns, as well as Octave's corporate returns. The information which was reported on petitioner's Federal income tax returns from year to year included, inter alia, income information from wages, rents, commissions from both real estate sales and insurance sales, dividends, interest, and both short-term and long-term capital gains; itemized deduction information for taxes, charitable contributions, interest paid, medical expenses, miscellaneous deductions and casualty loss deductions; business related schedules and expense deductions, including employee business expenses, rental income, depreciation schedules for both real property and personal property, utilities expense, insurance expense, taxes, legal fees, automobile expense, licenses and fees, capital improvements, office supplies and miscellaneous supplies and expenses. During their approximately 20-year relationship, Moscaritolo always found petitioner to be straight-forward and honest in providing him with information necessary to prepare his Federal income tax returns. Petitioner never asked Moscaritolo to understate his income, overstate *379 deductions, or otherwise falsify a tax return. IRS Audit and Notice of Deficiency
In 1968, the Intelligence Division of the Internal Revenue Service (IRS) initiated a criminal investigation of petitioners' tax returns for the years 1965, 1966, and 1967. James E. Russell (hereinafter Russell), a special agent for the IRS, was assigned to the case and he first met with petitioner on June 19, 1969. At this meeting, Russell reviewed petitioner's 1965, 1966, and 1967 returns line by line. Petitioner and Russell reviewed sources of income, petitioner's business and investment activities, and petitioner's method of keeping records of his income and expenses. On November 20, 1969, petitioner and Russell had a second meeting at which petitioner produced detailed records pertaining to his business and investment activities for Russell to examine. [13] At this meeting, petitioner explained to Russell where he obtained the money to purchase his real property. Finally, petitioner and Russell had a third meeting [14] at which they reviewed some checks that petitioner had written but which lacked notations explaining why they were issued. *380 Petitioner fully cooperated with Russell. He answered all of Russell's questions even though Russell had given petitioner a Miranda warning at their very first meeting. Russell asked for and obtained petitioner's permission to contact his attorney and return preparer, as well as any third parties such as banks and brokerage firms with which petitioner transacted business. Sometime in 1970, Russell was transferred to another IRS office and the criminal investigation of petitioners was continued by William R. Schirmer (hereinafter Schirmer). In addition to petitioners' 1965 through 1967 taxable years, Schirmer's investigation of petitioners included their 1968 through 1970 taxable years. Schirmer had at least 5 meetings with petitioner, and at least 1 meeting with petitioner's wife. Both petitioner and his wife received Miranda warnings from Schirmer. In the course of his investigation Schirmer learned that petitioner's wife played a relatively minor role in gathering the information needed for the preparation of their joint Federal income tax returns. She would obtain figures from various forms (i.e., 1099's) that were mailed to petitioners from banks in which they had *381 accounts or companies in which they owned stock. She also computed the family's medical expenses for purposes of ascertaining the amount of the medical deduction to be claimed on their joint return. Petitioner provided Schirmer with detailed and extensive information with respect to his financial affairs. Schirmer examined petitioner's and Octave's financial records and he did not discover any false entries or alterations contained therein. Schirmer did not find any evidence that petitioner maintained a double set of books or that petitioner had attempted to hide any of his assets. Petitioner explained to Schirmer that to the extent his recordkeeping was not the best, it was due to the fact he was working 7 days a week, supervising Octave's tavern, running his insurance business, and trying to locate tenants who owed him rent. In the course of Schirmer's investigation of petitioners he looked for evidence of civil or criminal fraud.While Schirmer found that petitioner did not keep complete records of all his business and investment activities, Schirmer never found anything that led him to believe that petitioner intentionally failed to keep adequate records in order to evade *382 taxes. Schirmer found petitioner and his wife to be straightforward and cooperative during the IRS investigation. Petitioner and his wife did not engage in any conduct to deceive or mislead Russell or Schirmer during the IRS investigation. During the course of their investigation, both Russell and Schirmer requested petitioners to sign consent forms extending the statute of limitations on assessment and collection of taxes; petitioners signed such forms. [15]
Based largely on Russell's and Schirmer's investigation of petitioners, respondent initially computed petitioners' net worth and increase in net worth from 1964 through 1968 to be the following: [16]
Year
Net Worth
Increase in Net Worth
1964
$58,274.60
1965
74,001.08
$15,726.48
1966
109,540.73
35,539.65
1967
145,277.32
35,736.59
1968
280,339.12
135,061.80
*383 In the notice of deficiency, respondent determined that petitioners understated their taxable income for 1965 through 1968, which resulted in an underpayment of taxes for each of those years. Respondent's determination was based on his computations of petitioner's net worth and increase in net worth over that period. Furthermore, respondent determined that a part of each underpayment for petitioners' 1965 through 1968 taxable years was due to fraud, and, therefore, he imposed the 50 percent addition to tax for fraud under section 6653(b). The following table shows the taxable income as reported on petitioners' joint returns, their taxable income as determined by respondent and the amount of unreported taxable income determined by respondent: Taxable Income
Taxable Income
Unreported Taxable [17]
Reported by
as Determined
Income as Determined
Year
Petitioners
by Respondent
by Respondent
1965
$ (5,570.76)
$12,432.30
$18,003.06
1966
(5,355.45)
28,877.81
33,233.26
1967
( 196.43)
36,710.88
36,907.31
1968
28,127.80 84,275.73
56,147.93
*384 ULTIMATE FINDING OF FACT No part of petitioners' understatement in taxable income for the taxable years 1965, 1966, 1967, or 1968 was due to fraud with intent to evade tax. OPINION We must determine whether any part of petitioners' underpayments of tax during the years in issue was due to fraud. Respondent maintains that an examination of petitioners' entire course of conduct during the years in issue will "show more than mere understatements" of income; specifically, it will show that petitioners fraudulently intended to understate their income. Petitioners, on the other hand, attribute their omissions of income to poor recordkeeping which was attributable primarily to petitioner's carelessness and informal and incomplete recordkeeping due to extreme business pressures. For the reasons set forth below, we hold that respondent has failed to establish a prima facie case of fraud. [18]
*385 A charge of fraud is not to be taken lightly and is never to be presumed. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F. 2d 1383 (8th Cir. 1978). Respondent has the burden of proving fraud for each year that it is alleged by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. The taxpayer must be shown to have acted with the specific intent to evade a tax believed to be owing. Mitchell v. Commissioner,118 F. 2d 308, 310 (5th Cir. 1941); Estate of Temple v. Commissioner,67 T.C. 143, 159 (1976). Since direct evidence of fraud is seldom available, respondent may meet his burden of proof through circumstantial evidence. Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978). Upon careful examination of the entire record, we do not think that respondent achieved what he set out to do at the commencement of the trial, namely, to prove fraudulent conduct on the part of petitioners that went beyond "mere understatements" *386 of income. Not one of the 3 witnesses which respondent called, Moscaritolo and IRS Special Agents Russell and Schirmer, gave any testimony which would justify a finding that petitioners fraudulently intended to evade taxes. In fact, all 3 witnesses expressly testified that they found petitioners to be straightforward and cooperative. Moscaritolo testified that petitioners did not conceal any records which he requested to see in the preparation of their returns. Russell and Schirmer both testified that petitioners provided them with detailed financial information with respect to their financial affairs, and neither special agent testified that he believed petitioners concealed any records during the investigation nor made any alterations to records which were provided to the IRS. During the course of examining his 3 witnesses, respondent attempted to zero in on the adequacy of the financial records maintained by petitioners. Respondent was able to obtain testimony from all 3 of his witnesses to the effect that petitioners failed to maintain complete books and records for their business and investment activities. Although a failure to maintain adequate books and records can *387 indicate fraudulent intent, we are not convinced that petitioners' incomplete records were the result of a fraudulent intent to evade taxes. In the first place, respondent's evidence in this area (as it was in virtually all areas) was rather sketchy. While all of respondent's witnesses agreed that petitioners' financial records were incomplete, we are without any sense of just how incomplete the records were. For example, Moscaritolo testified that during the course of the preparation of petitioners' returns, he would have petitioners furnish him with various financial records for purposes of substantiating their taxable income. Since petitioners' financial records were incomplete, there is no doubt that Moscaritolo was unable to substantiate all of his computations. Yet, respondent's direct examination of Moscaritolo left us uncertain as to the extent to which his computations were substantiated by financial records which petitioners furnished to him and the extent to which they were unsubstantiated. Moreover, insofar as a lack of records can be an indicia of fraud, we note that Moscaritolo testified that petitioners' records while incomplete, were "substantial." Furthermore, *388 IRS Special Agent Schirmer testified that he never found anything during the course of the investigation that led him to believe that petitioners kept inadequate records in order to evade taxes. To the contrary, the evidence in the record indicates that petitioners' incomplete records were due only to their own carelessness. Petitioner's wife left most of the recordkeeping to petitioner, who in turn would occasionally neglect his recordkeeping responsibility because of his very busy schedule. Throughout the trial, respondent failed to pursue a course which might have resulted in obtaining clear and convincing evidence of fraud. For example, petitioner admitted that certain wage income which petitioner received from Octave during 1968 was omitted from his return for that year. In addition, Moscaritolo, petitioner's return preparer for approximately 20 years, testified that he also prepared Octave's corporate income tax returns and had access to the company's payroll records which were maintained by petitioner. Nevertheless, respondent did not inquire of Moscaritolo whether petitioner's 1968 wage income was omitted on Octave's payroll records (i.e., evidence of concealment) or *389 whether such income was on the company's payroll records but overlooked in the course of the return preparation (i.e., evidence of extreme carelessness). Furthermore, respondent did not inquire of Moscaritolo the manner of review which petitioners gave to the returns once they were prepared. For example, did petitioners carefully review the returns which Moscaritolo prepared or did they rely on him and sign the returns without carefully reviewing them. If petitioners carefully reviewed the returns then it is likely they would have observed the omission of wage income, and their failure to correct the omission would be evidence of fraud. If, however, petitioners did not carefully review their returns once Moscaritolo had prepared them, petitioners may have failed to notice the omission of wage income. Although such conduct would certainly be negligent, establishing negligence does not prove that petitioners filed fraudulent returns. [19] Moreover, realizing that petitioners placed great trust in Moscaritolo, who had prepared their returns for approximately two decades, it is likely that they did not carefully review the accuracy of his work. In any event, however, respondent has *390 not established by clear and convincing evidence that petitioner's 1968 wage income from Octave was fraudulently omitted from the 1968 joint return. Even petitioners' concession that there were understatements of taxable income for all of the years in issue is not, given the facts of the instant case, a convincing indicia of fraud. While we recognize that substantial understatements of income can be evidence of fraud, it is well established, particularly in a net worth case, the such understatements are not sufficient evidence of fraud to support the imposition of the fraud addition to tax. [20]Holland v. United States,348 U.S. 121 (1954); Marinzulich v. Commissioner,31 T.C. 487, 490 (1958); Nicholson v. Commissioner,32 B.T.A. 977, 989 (1935), affd. 90 F. 2d 978 (8th Cir. 1937). Moreover, even though there were understatements of taxable income, we are unable to find that all of the understatements were substantial in amount. Except for petitioners' 1965 taxable year, the record fails to provide us with any clear idea of the amounts of *391 petitioners' understatements of taxable income for 1966, 1967, and 1968. Consequently, we do not find petitioners' own concession that there were understatements of taxable income during all years in issue to be very persuasive on the fraud issue. Finally, it is appropriate to point out several indicia which indicate an absence of fraudulent intent. First, petitioners fully cooperated with the IRS special agents during the course of their investigation. [21] In fact, petitioners signed consent forms waiving the statute of limitations for stated periods when Russell and Schirmer requested them to do so. [22] Second, while petitioner suspected that Pardee Acres incurred losses on its operations during 1966, 1967, and 1968, no such losses were claimed on his returns for those years. [23] The reason why no losses were claimed was because petitioners and Moscaritolo could not be certain as to the fact of such losses or the amounts thereof because petitioner's partner in the Pardee Acres partnership withheld such information from *392 them. If petitioners sought to fraudulently evade taxes, as respondent contends, it is likely that they might have "jumped the gun" and attempted to estimate the amount of such "suspected" losses. Moreover, the fact that petitioners did not claim a loss with respect to Pardee Acres on petitioners' 1966, 1967, or 1968 returns, is some evidence, albeit indirect, which supports Moscaritolo's testimony that he requested substantiation in the preparation of petitioners' returns. Lastly, Moscaritolo, whom we found to be a very credible witness, testified that petitioner never asked him to understate his income or otherwise cheat in the preparation of his Federal income tax returns. To the contrary, Moscaritolo always found petitioners cooperative and willing to supply him with whatever records they had. Furthermore, similar behavior was also exhibited by petitioners in their dealing with IRS Special Agents Russell and Schirmer.
*393 In conclusion, we are convinced that respondent has failed to prove fraud by clear and convincing evidence and, therefore, hold for petitioners. Due to a concession made by petitioners with respect to their 1966 taxable year. [24]
Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. On their 1966 joint Federal tax return, petitioners claimed a deduction for an unused capital loss carryover from a prior year. At trial the parties agreed that, notwithstanding the outcome of the instant case, such deduction would be disallowed.↩
3. Although the record is not entirely clear as to the precise date, it indicates that petitioner received his high school diploma from the Jefferson Veterans Unit, Rochester, New York, sometime in 1947.↩
4. The precise amount of petitioner's insurance commission income from U.S. Life is unclear from the record. The record reveals, however, that petitioner also sold insurance for other companies during the years in issue, and although petitioner did report insurance commissions on his Federal income tax returns, he did not specify the amount of commissions attributable to a specific insurance company. As to the amount of insurance commission income which petitioner reported on his Federal income tax returns for the years in issue, see our findings of fact herein.↩
5. The parties have stipulated that petitioner received commission income in the "total amount" of $18,601.02 for 1968. Since the record only establishes that $562,01 of such amount was received from Fidelity, we presume that the remaining $18,039.01 (i.e., $18,601.02 - $562.01) was received from either Indiana Lumberman's or U.S. Life, or both.↩
6. Anthony Moscaritolo is not a certified public accountant. His qualifications as a return preparer consisted of completing a two-year course of study at the Rochester Business Institute. During the years in issue, he prepared a total of approximately 300 individual and corporate tax returns. ↩
7. At the end of each year, U.S. Life would send petitioner a Form 1099 which showed the commission income paid to petitioner. The record does not indicate whether petitioner actually received a Form 1099 from the other insurance companies with which he did business. With respect to the expenses which petitioner incurred in operating his insurance business, U.S. Life would reimburse him monthly for 40 percent of such expenses. In order to obtain this reimbursement, petitioner would submit expense schedules to U.S. Life, which he also submitted to Moscaritolo for purposes of ascertaining the amount of petitioner's deductible business expenses. In the event that Moscaritolo had a question as to whether an expenditure was deductible, or if he did not know the exact amount of an expense, he would attmpt to substantiate the expense by examining petitioner's checking account records, including cancelled checks.↩
8. Petitioner figured into his total (i.e., gross) receipts all commissions which he received even if an amount of those commissions had to be paid by petitioner to other salesmen who placed their business through petitioner's insurance agency. To arrive at his net profit, therefore, petitioner subtracted those amounts which he in turn paid to others; such amounts represented the single largest "cost" of petitioner's insurance business.↩
9. The record does not indicate the extent to which Moscaritolo had to rely on estimates to calculate petitioner's income from his rental properties. It is clear, however, that petitioner, at least occasionally neglected to keep complete records with respect to his rental properties.↩
10. At trial, it was established that Pardee's operations produced a profit of $379.43 for 1966 and losses of $65.39 and $938.20 for 1967 and 1968, respectively. As a 50 percent partner, petitioner's share of such profit and loss would be one-half of the aforementioned amounts.↩
11. The record does not clearly indicate whether petitioner purchased the tavern business in a separate transaction and subsequently transferred the business to Octave, or whether petitioner loaned money to such corporation which in turn purchased the tavern (using petitioner to consummate the deal on its behalf). Although the parties have entered into stipulations on this point, the stipulations provide more ambiguity than insight.↩
12. Such a system provides for daily recording of income and weekly recording of expenses paid by check.↩
13. These records included, inter alia, canceled checks (personal and business) and check stubs from 1964 thorugh 1968, various bank statements (personal and business accounts), Octave's Dome Bookkeeping System records, commission statements from U.S. Life, and petitioner's income and expense records on his rental properties. ↩
14. The date of this meeting is not stated in the record, however, it had to occur prior to 1971 because Russell was transferred to another IRS office sometime in 1970.↩
15. The record provides no details as to the extension period to which the petitioners were asked to accept. In any event, the parties agree that, except for concessions made by petitioners, in the absence of fraud respondent is barred from assessing and collecting any deficiencies.↩
16. Upon further investigation, respondent computed the following additions to, and eliminations from, petitioners' net worth: Year
Additions to Net Worth
Eliminations from Net Worth
1964
$6,423.70
$3,563.71
1965
8,816.66
4,819.02
1966
7,854.28
6,440.87
1967
14,027.31
4,156.81
1968
5,101.71
46,769.77
Naturally, these additions to and eliminations from, petitioners' net worth modify respondent's initial computation of petitioners' net worth and increase in net worth (set forth in our findings of fact) during the years in issue.↩
17. While petitioners have generally conceded that they understated their taxable income during the years in issue, they have not, except for their 1965 taxable year, conceded the amount of the understatements. The parties have stipulated that petitioners' taxable income on their 1965 return was understated in the amount of $18,003.06.↩
18. In going forward with his proof, respondent called Moscaritolo, and IRS Special Agents Russell and Schirmer as his witnesses. At the conclusion of their testimony, respondent announced to the Court that he had no further witnesses. Counsel for petitioners then moved for a decision in their favor on the grounds that respondent had failed to prove fraud by clear and convincing evidence. We granted petitioners' motion.↩
19. See Brown v. Commissioner,T.C. Memo. 1977-138↩.
20. See also Sipes v. Commissioner,T.C. Memo. 1977-146, affd. without published opinion, 605 F. 2d 1205↩ (4th Cir. 1979).
21. A taxpayer's refusal to cooperate with the IRS has been found to be a factor in finding fraud. See Marinzulich v. Commissioner,31 T.C. 487, 492 (1958); Dworshak v. Commissioner,T.C. Memo. 1977-432; Brown v. Commissioner,supra.↩
22. Due to respondent's concession that in the absence of fraud, the statute of limitations bars assessment and collection of the deficiencies, it is obvious that Russell and Schirmer obtained consent forms in which the waiver period expired before respondent issued the notice of deficiency. We wish to note, however, that there is no evidence in the record that petitioners were unwilling to waive the statute of limitations for a period longer than whatever period was specified in the consent forms. ↩
23. Losses were in fact incurred for 1967 and 1968. See n. 10, supra.↩
24. See n. 2, supra.↩